IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: § | § | CHAPTER 11 |
| ALAMO IRON WORKS, INC., et al.,[1] § | § | CASE NO. 10-51269 |
| Debtors § | § | |

**EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO
11 U.S.C. §§ 105, 361, 362, 363, 364, 503 AND 507 OF THE BANKRUPTCY
CODE(I)(A) AUTHORIZING DEBTORS TO USE CASH COLLATERAL,
(B) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING,
(C) GRANTING SECURITY INTERESTS AND/OR SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS TO POST-PETITION LENDER, AND
(D) GRANTING ADEQUATE PROTECTION TO PRE-PETITION LENDER
(II) SCHEDULING A FINAL HEARING; AND (III) GRANTING RELATED RELIEF**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

Alamo Iron Works, Inc. ("**AIW**"), Southwest Wholesale Supply Co., Inc. ("**Southwest**"), Alamo Advertising, Inc. and Alamark Technologies, L.P. (collectively, the "**Debtors**"), the Debtors in the above captioned cases (the "**Cases**"), hereby file this *Emergency Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I)(A) Authorizing the Debtors to Use Cash Collateral, (B) Authorizing the Debtors to Obtain Post-petition Financing, (C) Granting Security Interests and/or Superpriority Administrative Expense Status to the Post-petition Lender, and (D) Granting Adequate Protection to the Pre-petition Lender; (II) Scheduling a Final Hearing; and (III) Granting Related Relief* (the "**Motion**"), and in support of this Motion, the Debtors respectfully represent as follows:

---

[1] The Debtors are the following entities: Alamo Iron Works, Inc., Southwest Wholesale Supply Co., Inc., Alamo Advertising, Inc., and AlaMark Technologies, L.P.
{L & B 12408/0002/L0422107.DOC}867215.4

1

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. PROCEDURAL BACKGROUND

2. On April 5, 2010 (the "**Petition Date**"), the Debtors filed their voluntary petitions for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**").

3. The Debtors continue to manage and operate their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No creditors' committee has been appointed in these cases by the United States Trustee. Further, no trustee or examiner has been requested or appointed.

4. The statutory predicates for the relief requested herein are sections 105, 361 and 363 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 4001 of the Federal Rules of Bankruptcy Procedure.

5. A further description of the background of the Debtors and the events leading up to the filing of these Cases is provided in the declaration of Anthony H. Koch, which is incorporated by reference herein.

## III. DESCRIPTION OF DEBT

6. Before the Petition Date, the Debtors financed their businesses pursuant to, among other things, a Revolving Credit, Term Loan and Security Agreement, dated December 23, 2009 (the "**PNC Credit Agreement**") between AIW and Southwest, as Borrowers, and PNC Bank, N.A. ("**PNC**", "**Lender**" or "**DIP Lender**"), as Lender and Agent. Pursuant to the PNC Credit Agreement, PNC provided a total commitment of $21,000,000 (the "**Pre-petition**

**Credit Facility**") comprised of a $15,000,000 revolving loan facility, a $5,000,000 term loan facility, and a $1,000,000 capital expenditure loan facility. As collateral security for their obligations under the Pre-petition Credit Facility, each Borrower granted to PNC continuing, first priority security interests in its Collateral (as defined in the PNC Credit Agreement), including, among other things, all of its accounts receivable, inventory, equipment, real estate, and general intangibles.

7. As of the Petition Date, the Debtors carried a balance of approximately $5,140,462 under the revolving loan facility (the "**Pre-petition Revolving Credit Facility Indebtedness**"), and $ 4,940,476 under the remaining Pre-petition Credit Facility.

8. The Lender will consider extending credit to the Debtors pursuant to that certain *Debtor in Possession Financing Agreement and Amendment to Revolving Credit, Term Loan and Security Agreement* (the "**DIP Agreement**" or "**Amendment**"). Pursuant to the DIP Agreement, the Lender (hereafter, the "**DIP Lender**") will make available a post-petition revolving loan up to an amount not to exceed $6,500,000.00. The terms of the DIP Agreement are more particularly described in the accompanying *Interim Agreed Order Authorizing Limited use of Cash Collateral, Obtaining Credit Secured by Senior Liens, and Granting Adequate Protection* (the "**Interim Order**" or "**Financing Order**") and the DIP Agreement, and are summarized below (however, the summary is subject to final documentation and any conflict between the summary, on the one hand, and the Interim Order and the DIP Agreement, on the other hand, shall be governed by the terms and conditions of the Interim Order and the DIP Agreement):

| | |
|---|---|
| **Borrower:** | AIW, Southwest, Alamo Advertising, Inc, and AlaMark Technologies, L.P. and each as debtors and debtors in possession (the "**Borrowers**" or "**Debtors**") |

| | |
|---|---|
| **DIP Lender:** | PNC Bank, N.A. |
| **The DIP Financing:** | The total senior secured first priority DIP facility (the "**DIP Facility**") shall be comprised of loans to be advanced and made available to the Borrowers (the "**Advances**") under a revolving credit facility (the "**DIP Revolving Loans**") in the aggregate maximum principal amount of up to $6.5 million (the "**DIP Commitment**"). |
| **Purpose:** | To refinance the Pre-petition Revolving Credit Facility Indebtedness and to fund (i) operating expenses and other amounts for general corporate and ordinary course purposes of the Borrowers, all in accordance with the DIP Budget (as defined below), (ii) current interest and fees on the DIP Facility, and (iii) such other administrative payments, including adequate protection payments with respect to the term loan under the Pre-petition Credit Facility and budgeted professional fees pursuant to the Carve-Out Budget (as defined below), as may be authorized and approved by the DIP Lender under the interim and final orders approving the DIP Facility (the "Interim Order" and the "Final Order", respectively, and together the "**DIP Orders**"). |
| | No portion of the DIP Facility, the DIP Collateral (as defined below), including any cash collateral, or the Carve-Out (as defined below) is to be used to (i) challenge the validity, perfection, priority, extent or enforceability of the DIP Facility, the obligations under or the PNC Credit Agreement (the "**Pre-petition Obligations**"), or the liens on or security interests in the assets of the Borrowers securing the DIP Facility or the Pre-petition Obligations (as defined in the DIP Agreement) or (ii) assert any other claims against PNC; provided, however, nothing herein shall be deemed to limit the use of the advances in respect of any determination under Section 506(a) of the Bankruptcy Code (a "**Section 506(a) Determination**"). |
| **Availability of Advances and related Sublimits** | • Availability shall be on the basis of daily certifications of the Borrowing Base and discretionary advances shall be as set forth in the DIP Agreement |
| | All criteria for (a) eligible assets, including without limitation the definitions of Eligible Accounts Receivable, Eligible Progress Billings and Eligible Inventory, (b) advance rates, and (c) applicable reserves and sublimits, shall be determined by the DIP Lender in its sole discretion. |
| **DIP Budget** | The DIP Budget, subject to the approval of the DIP Lender in its |

|                                          |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                  |
|------------------------------------------|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                                          | sole discretion, shall consist of the Borrowers' estimated projected cash flow position on a rolling 13-week basis (the "**DIP Budget**"), commencing as of the date of the entry of the Interim Order. Any subsequent changes to the DIP Budget may be made only on approval of the DIP Lender in its sole discretion. The Borrowers will be allowed variances in the DIP Budget, other than with respect to the Carve-Out Budget (as defined below) for professionals, measured weekly, as follows: as to sales; a 15% per week variance for the first two calendar weeks of these Cases and a 12% per week variance thereafter, not to exceed 12% cumulatively; as to receipts and disbursements, a 12% variance for the first calendar week of these Cases and a 10% per week variance, not to exceed 10% cumulatively. There shall no variances attributable or allowed with respect to the Carve-Out Budget. |
| **Maturity/Events of Default/Termination** | The Borrowers shall repay any outstanding advances under the DIP Facility in full in immediately available funds on, among others, the Maturity Date (as defined in the DIP Agreement), the Termination Date (as defined in the Interim Order) or the occurrence of an Event of Default (as defined in the Interim Order). |
| **Interest Rate:**                       | Interest shall be payable monthly in arrears in cash on the outstanding amount of the DIP Revolving Loans on the first business day of each month at a rate equal to the Alternate Base Rate (as defined in the PNC Credit Agreement) plus 3.5% per annum. In addition, interest payable as adequate protection on the term loan under the Pre-petition Credit Facility shall be payable at a rate equal to the applicable default rate of interest under the Pre-petition Credit Facility. |
| **Default Rate:**                        | Upon the occurrence and during the continuance of any event of default under the DIP Facility and at the election of the DIP Lender, interest shall be payable on all outstanding principal or any other obligation under the DIP Facility at 2.0% above the then applicable interest rate. |
| **Facility Fee**                         | A fee of $150M payable to the DIP Lender as follows: $50M upon the entry of the Interim Order (as defined below) and $100M upon the earlier of the Maturity Date or the termination of the DIP Facility. |
| **Unused Commitment Fee**                | A fee on the unused portion of the DIP Commitment of 2.0% per annum, payable monthly. |

| | |
|---|---|
| **Collateral Management Fee:** | Borrower shall pay to Lender a Collateral Management Fee in the amount of $3,000 in advance per month until all obligations under the DIP Facility are paid to Lender. |
| **Fees of DIP Lender's Professionals** | The DIP Lender shall be reimbursed the reasonable fees and expenses of its professionals for so long as the DIP Facility remains unpaid. |
| **Collateral:** | All obligations of Borrowers under and with respect to the DIP Facility (the "**DIP Obligations**") shall enjoy superpriority administrative expense status under Section 364(c)(1) with priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113, 1114 or any other provisions of the Bankruptcy Code, subject to the Carve-Out. |
| | To secure all of the DIP Obligations and Pre-petition Obligations, the DIP Lender shall receive, pursuant to Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, the DIP Orders and the definitive DIP Facility loan documents, valid, enforceable, and fully perfected first priority security interests in and liens upon all pre-petition and post-petition assets of the Debtors, whether now existing or hereafter acquired or arising (collectively, the "**DIP Collateral**"). DIP Collateral shall include all rights, claims and other causes of action of each Debtor's estate and any other avoidance actions under Chapter 5 of the Bankruptcy Code and the proceeds thereof and property received thereby whether by judgment, settlement or otherwise (collectively, "**Avoidance Actions**"). DIP Collateral shall also include, without limitation, any and all rents, issues, products, offspring, proceeds and profits generated by any item of DIP Collateral, without the necessity of any further action of any kind or nature by the DIP Lender in order to claim or perfect such rents, issues, products, offspring, proceeds and/or profits. |
| | Liens and security interests with respect to DIP Collateral (the "**DIP Liens**") shall not be subject to challenge and shall attach and become valid and perfected upon entry of the Interim Order without the requirement of any further action by the DIP Lender. DIP Collateral shall be free and clear of other liens, claims and encumbrances, except Prior Liens (as defined in, and set out on Schedule 1.2-1 of the PNC Credit Agreement). |
| | The Carve-Out (the "**Carve Out**") shall be a maximum amount set forth in the Interim Order to be applied to pay the sum of (i) the aggregate amount of any budgeted and accrued but unpaid, professional fees and expenses existing as of the Carve-Out Date |

867215.4

6

(as defined below) of the Debtors and any unsecured creditors' committee and for the fees and expenses of the Chief Restructuring Officer, which fees and expenses are approved by the Bankruptcy Court and in compliance with the Carve-Out Budget (Exhibit "**3**" to the Interim Order), plus (ii) all fees required to be paid to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 (the "**Carve Out**"). Prior to the Carve-Out Date, subject to entry of an appropriate order of the Bankruptcy Court (in form and substance acceptable to the DIP Lender in its sole discretion), the Borrowers shall be permitted to use advances under the DIP Facility to pay compensation and reimbursement of expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code in accordance with the Carve-Out Budget, provided that nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement, or compensation sought by the professionals retained by the Borrowers or any statutory committee in the Chapter 11 Cases.

"**Carve-Out Date**" means the date that is the earlier of any Borrower's receipt of a notice of default under the DIP Facility, the Maturity Date and the Termination Date.

Neither the advances under the DIP Facility nor in connection with the Carve-Out may be used to challenge the amount, validity, perfection, priority or enforceability of, or assert any defense, counterclaim or offset to the DIP Facility or the PNC Credit Agreement, or any matters related thereto, or the security interests and liens securing the DIP Obligations or the Pre-petition Obligations with respect thereto or otherwise to litigate against PNC; provided, however, the foregoing shall not apply to any advances or Carve-Out that are used for purposes of seeking a Section 506(a) Determination.

## IV. **RELIEF REQUESTED**

9. Pursuant to Bankruptcy Code sections 361 and 363, the Debtors request interim and final authority: (a) to use the cash collateral ("**Cash Collateral**") of PNC in accordance with the terms and conditions set forth herein, the proposed budget (the "**DIP Budget**") and Carve-Out Budget, and the proposed Interim Order; (b) to borrow funds, as necessary, pursuant to the DIP Agreement; (c) to use Cash Collateral and to borrow funds under the DIP

867215.4

7

Agreement on a final basis; and (d) to grant liens, administrative claims and adequate protection to PNC as more particularly set forth therein. Copies of the DIP Budget and Carve-Out Budget are attached hereto as **Exhibit A**. Copies of the DIP Budget and Carve-Out Budget will be served upon the United States Trustee, the unsecured with the 20 largest claims and PNC. A copy of the proposed DIP Agreement is attached hereto as **Exhibit B**. A copy of the proposed Interim Order is attached hereto as **Exhibit C**. **THE FORM OF THE DIP AGREEMENT AND FORM OF THE INTERIM ORDER REMAIN SUBJECT TO FINAL APPROVALS BY THE DIP LENDER AND BY DEBTORS.**

10. The Debtors request authorization to use cash collateral, and to borrow funds under the DIP Agreement, to pay overhead, operating expenses and ordinary course of business obligations that are necessary to maintain and preserve the going-concern value of their assets and businesses, and to administer their estates, including, but not limited to, using Cash Collateral or borrowing funds, as necessary, to pay the post-petition operations of the Debtors' businesses and all costs and expenses arising in connection with the administration of their estates. The Debtors also seek authority to grant security interests and adequate protection as set forth below. Finally, the Debtors seek to schedule a final hearing on this Motion.

## V. AUTHORITY AND ARGUMENTS

A. **Debtor-in-Possession Financing**

   (i) **Senior Lien on Collateral of Existing Lender**

11. Section 364(d) of the Bankruptcy Code provides that the Debtors may obtain post-petition financing by granting a lien on property of the estate that is senior or equal to liens that already exist on such property, so long as the Debtors provides adequate protection of the previous lienholders interest in such property. *In re Swedeland Development Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (Debtors must provide adequate protection to pre-petition

867215.4

8

secured creditor in order to obtain post-petition superpriority financing); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (Debtors must establish that the credit transaction is necessary to preserve the estate and the terms of the transaction are fair and reasonable).

12. Section 364(d) of the Bankruptcy Code provides:

(d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if —

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

13. The Debtors satisfy the requirements of section 364(d) of the Bankruptcy Code as they are unable to obtain credit otherwise. The Debtors seek to grant a senior lien upon the collateral of PNC, who has agreed to the granting of such lien provided that the first advance under the DIP Facility will pay the balance due on the revolving portion of the Pre-petition Credit Facility in full and that all of the Pre-petition Obligations owed to PNC will be secured thereby as well. As such, the Pre-petition Credit Facility is adequately protected. The parties listed on Schedule 1.2-1 to the PNC Credit Agreement are not affected by this request for a senior or equal lien. However, Anthony H. Koch and Charles E. Koch hold a mortgage against one parcel of real estate that is subordinate to the Pre-petition Credit Facility of PNC and have consented to the terms and conditions of the DIP Facility and shall remain subject to all agreements that they have with PNC. Furthermore, as will be demonstrated below, PNC will be provided additional adequate protection during the Case.

867215.4

14. The proposed DIP Agreement is required to preserve and maintain the Debtors' going concern value and is, therefore, in the best interest of the Debtors' estate and creditors. The revolving credit the DIP Lender will provide under the DIP Agreement is necessary to provide working capital for the Debtors to continue purchasing inventory and raw materials and to afford the Debtors' suppliers, other vendors and customers the necessary confidence to continue ongoing relationships with the Debtors, including the extension of credit terms for the payment of goods and services. The DIP Agreement will be viewed favorably by the Debtors' employees, minimize disruption to the Debtors' business and ongoing operations, and avoid immediate and irreparable harm to the Debtors, their creditors, businesses, employees, and assets.

15. The terms and conditions of the DIP Agreement are fair, reasonable, and appropriate, and were extensively negotiated by the parties in good faith and at arms' length. In the Debtors' business judgment, the DIP Facility and DIP Agreement represents the best financing option to effectuate these purposes and advance the Debtors' reorganization efforts.

16. Additionally, the Carve-Out is fair, reasonable, and appropriate. The Carve-Out will ensure that the Debtors and any official committees are able to obtain the assistance of counsel, thereby promoting the collective rights and expectations of parties in interest. *See In re Ames Dep't Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (noting that courts generally insist on "a carve out" for the professional fees of debtors' counsel, counsel for official committees, and possible trustee's counsel "to preserve the adversary system" and that "[a]bsent such protection, the collective rights and expectations of all parties in interest are sorely prejudiced").

17. Likewise, the various fees and charges required under the DIP Agreement are reasonable and appropriate under the circumstances. Indeed, courts routinely authorize similar lender incentives that extend beyond the specific liens and rights specified in Bankruptcy Code section 364. *See R.T.C. v. Official Unsecured Creditors Committee (In re Defender Drug Stores, Inc.)*, 145 B.R. 312, 316-318 (B.A.P. 9th Cir. 1992) (approving financing facility pursuant to section 364 that included a lender "enhancement fee").

### (ii) Additional Liens on Unencumbered Assets or Second Liens

18. Pursuant to section 364(c) of the Bankruptcy Code, if a debtor has been unable to obtain unsecured credit and the borrowing is in the best interests of the estates, it may also in the exercise of its business judgment grant liens on its unencumbered assets or junior liens on its encumbered assets,. *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 448-9 (Bankr. D. Colo. 1985) (authorizing interim financing stipulation where debtors' best business judgment indicated financing was necessary and reasonable for benefit of estates); *In re Ames Dept. Stores,* 115 B.R. at 38 (with respect to post-petition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties.")

19. Section 364(c) of the Bankruptcy Code provides:

(c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt-

> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

867215.4

20. The Debtors have been unable to procure the funds they require in the form of unsecured credit or unsecured credit with an administrative priority. Under the circumstances, the Debtors should be authorized to enter into a secured financing arrangement under section 364(c) of the Bankruptcy Code.

21. Having determined that financing was available only under sections 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated the DIP Agreement at arms' length and pursuant to their best business judgment. Such negotiations are to be accorded great weight so long as they do not run afoul of the provision of and policies underlying the Bankruptcy Code. *See, e.g., Bray v. Shenandoah Federal Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (approving debtor-in-possession financing necessary to sustain seasonal business); *In re Ames Dep't Stores*, 115 B.R. at 40 (with respect to post-petition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties.").

22. In satisfying the standards of section 364(c) and (d) of the Bankruptcy Code, a debtor need not seek credit from every available source, but should make a reasonable effort to seek other sources of credit available of the type set forth in sections 364(a) and (b) of the Bankruptcy Code. *In re Snowshoe Co.*, 789 F.2d at 1088 ("the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"). Instead, the debtor's efforts are to be considered on a case by case basis, particularly "[g]iven the 'time is of the essence' nature of this type of financing." *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). In *In re Sky Valley, Inc.*, 100 B.R. 107, 112-13 (Bankr. N.D. Ga. 1988), the Court stated that "it would be unrealistic and unnecessary to require debtors to conduct such an exhaustive search for financing" where the business suffered from financial

stress, had little or no unencumbered property, and the primary property was subject to numerous liens, and thus the debtor's approach of only four lenders was sufficient under such circumstances.

23. The DIP Facility and DIP Agreement is clearly for the benefit of the Debtors' estate and creditors. As set forth above, it is critical to maintaining the Debtors' operations and, thus, preserving and enhancing the Debtors' going concern value. With the additional liquidity provided by the DIP Facility and DIP Agreement, the Debtors will be able to obtain goods and services in connection with their operations on normal credit terms, thereby permitting the Debtors to generate revenues, pay their employees, and operate their businesses for the benefit of all parties-in-interest.

24. The terms and conditions of the DIP Facility and DIP Agreement are fair and reasonable and were negotiated by the parties in good faith and at arms' length. Accordingly, the DIP Lender should be accorded the benefits of section 364(e) of the Bankruptcy Code in respect of the Loan.

### B. Immediate Need for Use of Cash Collateral

25. The Debtors' use of property of the estates is governed by Bankruptcy Code section 363(c), which provides, in relevant part:

> (1) If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.
>
> (2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless – (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363 (c)(1)-(2).

26. The Debtors require immediate use of Cash Collateral in the amount set forth in the DIP Budget (and, as applicable, the Carve-Out Budget), including cash proceeds, to continue the operation of their businesses. Without such funds, the Debtors will not be able to pay costs and expenses, including, but not limited to, wages, salaries, rent, professional fees, general and administrative operating expenses, delivery costs and others that arise in the administration of these Cases and in the ordinary course of the Debtors' businesses. Without authorization to use the Cash Collateral under section 363(c)(2)(B) of the Bankruptcy Code, the Debtors would be left without their primary source of working capital.

27. Absent the ability to use Cash Collateral as set forth in the DIP Budget (and, as applicable, the Carve-Out Budget), the Debtors will be forced to shut down all of their operations abruptly, which will negatively impact the value of their assets and eliminate any prospect for a distribution to unsecured creditors. The Debtors further believe that an abrupt shutdown will result in a severe and dramatic loss of collateral value, causing PNC to receive a drastically reduced value for the collateral securing the indebtedness under the pre-petition credit agreements (the "Pre-petition Collateral").

28. The Debtors request interim authorization to use Cash Collateral as set forth in the DIP Budget (and, as applicable, the Carve-Out Budget) until a final order granting further use of cash collateral can be entered. The Debtors are without sufficient funds, other than Cash Collateral, to operate until a final hearing on this Motion can be held. The Debtors' inability to timely pay the costs and expenses set forth in the DIP Budget (and, as applicable, the Carve-Out Budget) will result in immediate and irreparable harm to their assets. Because the Debtors' request for interim authorization seeks the use of only that amount of Cash Collateral as is necessary to avoid immediate and irreparable harm to the value of its assets pending a final

hearing, its request complies with Rules 4001(b)(2) and 6003 of the Federal Rules of Bankruptcy Procedure.

29. The DIP Budget (and, as applicable, the Carve-Out Budget) itemizes the sources and uses of cash and provides a weekly projection of cash receipts and expenditures, including a list of business expenses that are reasonable and necessary and that must be paid in order to continue the Debtors' businesses until such time as a final hearing on the Motion can be held. The Borrowers will be allowed the variances set forth in the DIP Agreement. PNC shall be reimbursed the reasonable fees and expenses of its professionals for so long as PNC remains unpaid.

30. The Debtors also request that the Court authorize them to continue using Cash Collateral as set forth in the DIP Budget (and, as applicable, the Carve-Out Budget) or any substitute budget approved by the DIP Lender, in its sole discretion, after a final hearing on the Motion.

## C. Grant of Adequate Protection Pursuant to Bankruptcy Code § 363(e)

31. Bankruptcy Code section 363(e) provides that "on request of an entity that has an interest in property used . . . or proposed to be used . . ., the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Providing adequate protection is mandatory. Bankruptcy Code section 361 sets forth a non-exclusive list of forms of adequate protection, which include periodic cash payments, additional liens, replacement liens, and other forms of relief. 11 U.S.C. § 361. A determination of adequate protection is decided on a case-by-case basis, involving a consideration of the "nature of the creditor's interest in the property, the potential harm to the creditor as a result of the property's decline in value and the method of protection." *Memphis-Shelby County Airport*

*Authority v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 783 F.2d 1283, 1286 (5th Cir. 1986). The purpose of adequate protection is to ensure that a secured party's economic position is not worsened because of the filing of a bankruptcy case. *In re DeSardi*, 340 B.R. 790, 804 (Bankr. S.D. Tex. 2006).

32. The Debtors propose to adequately protect PNC's interest in their Pre-petition Collateral in numerous ways. First, the Debtors believe that the value of the Pre-petition Collateral may exceed the sum total of the indebtedness to PNC, however, the resulting equity cushion may not protect PNC against any decrease in the value of its interests in the Pre-petition Collateral for the duration of the requested use of its Cash Collateral and other Pre-petition Collateral interests.

33. Second, the Debtors propose to grant PNC liens in connection with its Pre-petition Obligations as set forth herein and in the Interim Order. The Debtors anticipate that those liens will adequately protect PNC for the use of Cash Collateral and otherwise.

34. Third, the Debtors will provide PNC with ample information relating to projected revenues and expenses, actual revenue and expenses, and variances from the DIP Budget (and, as applicable, the Carve-Out Budget). This information will enable PNC to monitor its interests in the Pre-petition Collateral, DIP Collateral, Collateral and Cash Collateral. Reporting of financial information can also be a sufficient form of adequate protection. *See, e.g., Mutual Benefit Life Ins. Co. v. Stanley Station Assocs., L.P. (In re Stanley Station Assocs., L.P.)*, 140 B.R. 806, 809 (D. Kan. 1992) ("In addition, we believe the request . . . for 'timely filing of proper monthly operating reports . . .' falls within the ambit of adequate protection. . . ."); *Sumitomo Trust & Banking Co. v. Holly's, Inc. (In re Holly's, Inc.)*, 140 B.R. 643, 706 (Bankr. W.D. Mich. 1992) (periodic financial reports required as part of adequate protection).

## VI. NOTICE AND ESTABLISHING NOTICE PROCEDURES

### A. Notice With Respect to Interim Cash Collateral

35. Notice of this Motion has been given by email to the office of the United States Trustee for the Western District of Texas and to PNC and its counsel. A copy of the Motion shall be mailed to (i) the holders of the thirty (30) largest unsecured claims against the Debtor; as well as all parties listed on the Order Limiting Notice, counsel and parties-in-interest. The Debtors submit that under the circumstances, no further notice of the hearing on the interim financing is necessary and request that any further notice be dispensed with and waived.

### B. Notice With Respect to Final Hearing

36. The Debtors respectfully request that the Court set a final hearing date on the Motion for such time as is available in the Court's discretion and authorize the Debtors to serve a copy of this Motion and any interim order which fixes the time and date for filing objections to this Motion, by first class mail upon (i) counsel to any official committee of unsecured creditors appointed in this case; (ii) the Office to the United States Trustee; (iii) all parties who have filed requests for notice under Bankruptcy Rule 2002; (v) the twenty (20) largest unsecured creditors of the Debtors at their last known addresses; (vi) PNC and its counsel; and (vii) all other parties ordered by the Court. The Debtors request that the Court deem such notice of the final hearing to be sufficient notice under Bankruptcy Rule 4001.

## VII. PRAYER

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order (a) authorizing, on an interim basis, the DIP Facility, the DIP Agreement and Debtors' use of Cash Collateral; (b) authorizing on a final basis the DIP Facility, the DIP Agreement and Debtors' use of Cash Collateral or scheduling a final hearing on this Motion; and (c) granting the

relief to PNC as more particularly set forth herein and modifying the automatic stay to enable PNC to perfect all liens, if necessary. The Debtors further request that the Court grant it such other and further relief to which they may be justly entitled.

Dated: April 5, 2010

Respectfully submitted,

LANGLEY & BANACK, INCORPORATED
Suite 900, Trinity Plaza II
745 East Mulberry
San Antonio, TX 78212-3166
Telephone: (210)-736-6600
Fax: (210) 735-6889
E-mail: dgragg@langleybanack.com

By: /s/ David S. Gragg
DAVID S. GRAGG
Texas Bar No. 08253300
STEVEN R. BROOK
Texas Bar No. 03042300
ALLEN DeBARD
Texas Bar No. 24065132

PROPOSED ATTORNEYS FOR THE
DEBTORS AND DEBTORS-IN-POSSESSION