# ASSET PURCHASE AGREEMENT

BY AND AMONG

## ALAMO DISTRIBUTION, LLC,

on the one hand,

## AND

## ALAMO IRON WORKS, INC.,

## SOUTHWEST WHOLESALE SUPPLY CO., INC.,

## ALAMARK TECHNOLOGIES, L.P.,

and

## ALAMO ADVERTISING, INC.,

on the other hand

**Dated as of April 8, 2010**

# TABLE OF CONTENTS

ARTICLE I      DEFINITIONS..................................................................................1
  1.1.  Definitions..........................................................................................1
  1.2.  Interpretation....................................................................................10

ARTICLE II     THE PLAN OF ACQUISITION ...............................................10
  2.1.  Acquisition of the Assets .................................................................10
  2.2.  Excluded Assets ...............................................................................11
  2.3.  Other Assets ....................................................................................12
  2.4.  Assumed Liabilities; Excluded Liabilities......................................12
  2.5.  Assignment and Assumption of Contracts......................................12
  2.6.  Non-Assignment of Assets ..............................................................13
  2.7.  Changes in Assumed Contracts .......................................................13
  2.8.  Schedules. ........................................................................................13

ARTICLE III    PURCHASE PRICE ..................................................................14
  3.1.  Purchase Price and Payment ...........................................................14
  3.2.  Inventory Adjustment.......................................................................14
  3.3.  Proration of Certain Items................................................................14

ARTICLE IV    CLOSING AND TERMINATION .............................................14
  4.1.  Closing Date.....................................................................................14
  4.2.  Deliveries by Seller..........................................................................15
  4.3.  Deliveries by Purchaser ...................................................................15
  4.4.  Termination of Agreement................................................................15
  4.5.  Procedure Upon Termination ...........................................................16
  4.6.  Effect of Termination.......................................................................16

ARTICLE V     REPRESENTATIONS AND WARRANTIES OF SELLER..........17
  5.1.  Due Organization and Qualification ...............................................17
  5.2.  Authorization; Non-Contravention; Approvals. ..............................17
  5.3.  Subsidiaries......................................................................................18
  5.4.  Financial Information........................................................................18
  5.5.  Liabilities and Obligations...............................................................19
  5.6.  Assets. ..............................................................................................19
  5.7.  Contracts. .........................................................................................21
  5.8.  Inventory ..........................................................................................21
  5.9.  Permits .............................................................................................21
  5.10.  Environmental Matters......................................................................22
  5.11.  Labor and Employee Relations.........................................................22
  5.12.  Insurance ..........................................................................................23
  5.13.  Compensation; Employment Agreements .......................................23
  5.14.  Noncompetition, Confidentiality and Nonsolicitation Agreements...23
  5.15.  Employee Benefit Plans....................................................................23
  5.16.  Litigation and Compliance with Law ..............................................23
  5.17.  Taxes................................................................................................23

5.18.   Absence of Changes.................................................................................24
5.19.   Absence of Certain Business Practices.....................................................25
5.20.   Competing Lines of Business; Related-Party Transactions.......................25
5.21.   Intangible Property.................................................................................25
5.22.   Customers and Suppliers.........................................................................26
5.23.   Accuracy of Information..........................................................................26

ARTICLE VI      REPRESENTATIONS AND WARRANTIES OF PURCHASER.................26
6.1.   Organization...........................................................................................26
6.2.   Authorization; Non-Contravention; Approvals. .....................................26

ARTICLE VII     BANKRUPTCY COURT MATTERS ........................................................27
7.1.   Bankruptcy Court Filings........................................................................27
7.2.   Competing Transactions. ........................................................................28
7.3.   Break-Up Fee and Expense Reimbursement ...........................................28
7.4.   Bankruptcy Estate Consolidation............................................................29

ARTICLE VIII    COVENANTS .........................................................................................29
8.1.   Access to Information; Inventory Inspection............................................29
8.2.   Real Estate Matters. ...............................................................................30
8.3.   Conduct of the Business Pending the Closing. ........................................31
8.4.   Consents.................................................................................................32
8.5.   Further Assurances.................................................................................32
8.6.   Preservation of Records .........................................................................33
8.7.   Publicity ................................................................................................33
8.8.   Supplementation and Amendment of Schedules .....................................33
8.9.   Post-Closing Wind-Up............................................................................34
8.10.   Confidentiality .......................................................................................34
8.11.   Financing................................................................................................34
8.12.   Employees...............................................................................................34
8.13.   Weekly Financial Reports .......................................................................36
8.14.   Collection of Accounts Receivable...........................................................36

ARTICLE IX      NONCOMPETITION COVENANTS.......................................................37
9.1.   Prohibited Activities. .............................................................................37
9.2.   Equitable Relief .....................................................................................37
9.3.   Reasonable Restraint..............................................................................38
9.4.   Severability; Reformation .......................................................................38
9.5.   Material and Independent Covenant .......................................................38

ARTICLE X       CLOSING CONDITIONS........................................................................38
10.1.   Conditions Precedent to Obligations of Purchaser .................................38
10.2.   Conditions Precedent to Obligations of Seller.........................................41
10.3.   Conditions Precedent to Obligations of Purchaser and Seller .................41
10.4.   Frustration of Closing Conditions............................................................41

ARTICLE XI     TAXES ..................................................................................................42
    11.1.   Transfer Taxes ...............................................................................42
    11.2.   Purchase Price Allocation .............................................................42
    11.3.   Cooperation and Audits ................................................................42

ARTICLE XII    MISCELLANEOUS ................................................................42
    12.1.   Assignment ...................................................................................42
    12.2.   Entire Agreement ..........................................................................43
    12.3.   Amendment; Waiver .....................................................................43
    12.4.   Expenses ......................................................................................43
    12.5.   Exercise of Rights and Remedies .................................................43
    12.6.   Reformation and Severability .......................................................43
    12.7.   Notices .........................................................................................43
    12.8.   Governing Law .............................................................................44
    12.9.   Submission to Jurisdiction; Consent to Service of Process. .........44
    12.10.  Waiver of Right to Trial by Jury ...................................................45
    12.11.  Counterparts .................................................................................45
    12.12.  Personal Liability .........................................................................45

# LIST OF EXHIBITS AND SCHEDULES

## EXHIBITS

Exhibit A – Bidding Procedures Order
Exhibit B – Weekly Budget
Exhibit C – Form of Weekly Financial Report

## SCHEDULES

Schedule 2.1(b) – Business Facilities
Schedule 2.3 – Other Assets
Schedule 2.5 – Assumed Contracts
Schedule 2.8(a) – Schedules to Be Delivered by Seller upon the Execution of this Agreement
Schedule 3.2 – Interim Inventory Value
Schedule 5.2(c) –Authorization; Non-Contravention; Approvals
Schedule 5.5 – Liabilities and Obligations
Schedule 5.6 – Equipment; Leases and Subleases
Schedule 5.7(b) – Contracts
Schedule 5.9 – Assigned Permits
Schedule 5.10 – Environmental Matters
Schedule 5.12 – Insurance
Schedule 5.13 – Compensation; Employment Agreements
Schedule 5.14 – Noncompetition, Confidentiality and Nonsolicitation Agreements
Schedule 5.16 – Litigation and Compliance with Law
Schedule 5.17 – Taxes
Schedule 5.18 – Absence of Changes
Schedule 5.20 – Competing Lines of Business; Related-Party Transactions
Schedule 5.21 – Assigned Intangible Property
Schedule 5.22 – Customers and Suppliers
Schedule 8.12(e) – Terminated Employment Benefit Plans

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement, dated as of April 8, 2010, is by and among Alamo Distribution, LLC, a Delaware limited liability company ("Purchaser"), Alamo Iron Works, Inc., a Texas corporation ("AIW"), Southwest Wholesale Supply Co., Inc., a Texas corporation ("Southwest"), AlaMark Technologies, L.P., a Texas limited partnership ("AlaMark"), and Alamo Advertising, Inc., a Texas corporation ("Advertising" and together with AIW, Southwest, and AlaMark, each a "Seller" and collectively, "Seller").

## RECITALS

WHEREAS, on the date hereof, Seller has filed voluntary petitions for relief (the "Petitions") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Texas (the "Bankruptcy Court") (the "Bankruptcy Case");

WHEREAS, subject to the terms and conditions set forth herein and the approval and order of the Bankruptcy Court, Seller is agreeing to sell the Assets in accordance with sections 105, 363, and 365 of the Bankruptcy Code;

WHEREAS, Purchaser is agreeing to purchase the Assets and assume the Assumed Liabilities, all on the terms and conditions set forth herein; and

NOW, THEREFORE, in consideration of the premises and of the mutual agreements, representations, warranties, provisions and covenants contained herein, the parties, intending to be legally bound, agree as follows:

## ARTICLE I
## DEFINITIONS

**1.1.** **Definitions.** Capitalized terms used in this Agreement shall have the following meanings:

"2008 Financial Statements" has the meaning set forth in Section 5.4(a)(i).

"2009 Financial Statements" has the meaning set forth in Section 5.4(a)(ii).

"Accounts Receivable" means the accounts and notes receivable of Seller relating to the Business that have been billed to the customer.

"Acquisition Proposal" means any proposal by a Third Person to acquire any Seller (a) through a merger or consolidation, (b) through a purchase of more than 10% of the assets of any Seller, or (c) through a purchase of outstanding stock or partnership interests or newly issued stock or partnership interests of any Seller which results in the Third Person owning more than 20% of any Seller.

"Advertising" has the meaning set forth in the preamble of this Agreement.

"Affiliate" of, or "Affiliated" with respect to a specified Person means a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the specified Person.

"Agreement" means this Asset Purchase Agreement.

"AIW" has the meaning set forth in the preamble of this Agreement.

"AIW Web Site" means the web site located at www.aiwnet.com.

"AlaMark" has the meaning set forth in the preamble of this Agreement.

"Allocation Statement" has the meaning set forth in Section 11.2.

"Assets" has the meaning set forth in Section 2.1.

"Assigned Intangible Property" means all Intangible Property attributable to, arising from or used in connection with the Business, including that set forth in Schedule 5.21, and all goodwill associated therewith and the rights and privileges used to conduct the Business

"Assigned Permits" has the meaning set forth in Section 2.1(l).

"Assumed Contracts" has the meaning set forth in Section 2.5.

"Assumed Liabilities" has the meaning set forth in Section 2.4.

"Auction Date" has the meaning set forth in Section 2.7.

"Balance Sheet Date" means February 28, 2010.

"Bankruptcy Case" has the meaning set forth in the recitals of this Agreement.

"Bankruptcy Code" has the meaning set forth in the recitals of this Agreement.

"Bankruptcy Court" has the meaning set forth in the recitals of this Agreement.

"Bankruptcy-Related Fees" means any fees and expenses (including out-of-pocket expenses) incurred by or otherwise due from Seller (whether or not billed and regardless of when incurred or accrued) that are related to the Bankruptcy Case or Seller's refinancing, restructuring, or sale efforts, including the fees and expenses for any of the following: (i) counsel for Seller; (ii) financial advisors to Seller; (iii) any professional retained in the Bankruptcy Case, and (iv) any (if any) employee of Seller for any transaction or retention bonuses or other similar obligation. For the avoidance of doubt, Bankruptcy-Related Fees do not include any fees and expenses incurred by Purchaser.

"Bidding Procedures Order" means an order of the Bankruptcy Court that approves, among other things, the payment of the Break-Up Fee and the Expense Reimbursement on the terms set forth herein and includes the other matters set forth in the form attached hereto as Exhibit A.

"Break-Up Fee" has the meaning set forth in Section 7.3.

"Business" means all of the business engaged in by Seller, including Seller's industrial supply business.

"Business Day" means any day other than a Saturday, Sunday, or other day on which commercial banks in San Antonio, Texas are authorized or required to close.

"Business Employees" means the employees employed by Seller in connection with the Business and listed on Schedule 5.13.

"Business Facilities" means those certain plots, tracts or parcels of real property located at 943 AT&T Center Parkway, San Antonio, Texas 78219 (the "943 AT&T Center Parkway Property") and 126 Gonzales Street, San Antonio, Texas (the "126 Gonzales Street Property"), and more particularly described in Schedule 2.1(b), together with all buildings and other improvements situated thereon, all fixtures and other property affixed thereto, and all rights and appurtenances pertaining thereto, including any and all easements and other rights as may be necessary for ingress and egress and maintenance of such property and any right, title and interest of Seller in and to adjacent streets, alleys, and rights-of-way.

"Closing" has the meaning set forth in Section 4.1.

"Closing Date" has the meaning set forth in Section 4.1.

"Closing Date Purchase Price" has the meaning set forth in Section 3.1.

"Closing Inventory Value" has the meaning set forth in Section 3.2.

"COBRA" means Section 4980B of the Code and Section 601 et seq. of ERISA.

"Code" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"Collection Services Fee" has the meaning set forth in Section 8.14.

"Competing Transaction" has the meaning set forth in Section 7.2(a).

"Competitive Business" means any business providing procurement, management, and/or application of maintenance, repair, operating, or production ("MROP") products or services to users or consumers of MROP products, including steel, cutting tools, abrasives, hand and power tools, maintenance equipment, coolants, lubricants, adhesives, and safety products; machine tools and accessories; material handling equipment; machinery; tapes; fasteners; electrical; saw blades; brushes; welding equipment and supplies; industrial pipes, valves, fittings, and metal goods; quality control products; contractor supplies; and tool and die supplies.

"Confidential Information" means all information of a confidential or proprietary nature (whether or not specifically labeled or identified as confidential), in any form or medium, that relates to the business, products, services, or research or development of Seller or its suppliers,

distributors, customers, independent contractors, or other business relations. The term "Confidential Information" shall not, however, include information which (i) is or becomes publicly available other than as a result of a disclosure by Purchaser or the Purchaser Representatives, (ii) is or becomes available to Purchaser on a non-confidential basis from a source (other than Seller) which, to the best of Purchaser's knowledge after due inquiry, is not prohibited from disclosing such information to Purchaser by a legal, contractual, or fiduciary obligation to Seller, or (iii) has been independently acquired or developed by Purchaser or the Purchaser Representatives without using any Confidential Information or violating any of its obligations under this agreement.

"Confidentiality Agreement" means that certain Non-Disclosure Agreement, dated as of February 25, 2010, by and between AIW and LKCM Capital Group, LLC.

"Consolidation Order" has the meaning set forth in Section 7.3.

"Continuation Coverage" means continuation health coverage requirements under COBRA.

"Contract" means, with respect to any Person, any agreement, arrangement, commitment, contract, or instrument of any type whatsoever, whether oral or written, express or implied, including any conditional sales agreements, deeds of trust, guaranties, leases, license agreements, mortgages, non-competition agreements, notes, pledge agreements, purchase and sales orders, security agreements, or warranties, to which a Person is a party or by which any of its properties or assets may be bound.

"Cure Amounts" has the meaning set forth in Section 2.5.

"DIP Credit Agreement" means that certain debtor-in-possession financing agreement to be entered into by and among Seller and the DIP Lender, as lender, in form and substance satisfactory to Purchaser.

"DIP Lender" means PNC Bank, in its capacity as administrative agent under the DIP Credit Agreement.

"Employee Plans" means all "employee benefit plans," as defined in Section 3(3) of ERISA.

"Encumbrances" means all liens, claims, encumbrances, mortgages, pledges, security interests, conditional sales agreements, consignments, charges, options, preemptive rights, rights of first refusal, reservations, restrictions, or other encumbrances or defects in title.

"Environmental, Health and Safety Laws" means any federal, state or local Law, now in effect, including any judicial or administrative interpretation thereof, any judicial or administrative order, consent decree or judgment, or agreement with any Governmental Authority, relating to (a) pollution, exposure to oil, pollutants, contaminants, hazardous or toxic materials or waste, (b) the protection, preservation or restoration of the environment, including laws relating to exposures to, or emissions, discharges, releases or threatened releases of oil, pollutants, contaminants, hazardous or toxic materials or wastes into ambient air, surface water, ground water or land surface or subsurface strata, (c) the manufacture, processing, labeling,

distribution, use, treatment, storage, transport, handling or disposal of oil, pollutants, contaminants, hazardous or toxic materials wastes, or (d) the environment, plant and animal life, natural resources or health, safety or any Hazardous Substance. "Environmental, Health and Safety Laws" include (i) the Federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9601 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq., the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq., the Toxic Substances Control Act, 15 U.S.C. §§ 2601 et seq., the Clean Air Act, 42 U.S.C. §§ 7401 et seq., the Safe Drinking Water Act, 42 U.S.C. §§ 300f et seq., the Hazardous Materials Transportation Act, 49 U.S.C. §§ 5101 et seq., the Atomic Energy Act, 42 U.S.C. §§ 2011 et seq., the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. §§ 136 et seq., and the Occupational Safety and Health Act, 29 U.S.C. §§ 651 et seq., in each case as amended from time to time, and any other federal, state or local Laws now relating to any of the foregoing, and (ii) any common law or equitable doctrine (including injunctive relief and tort doctrines such as negligence, nuisance, trespass and strict liability) that may impose liability or obligations for injuries or damages due to, or threatened as a result of, the presence of, effects of or exposure to any Hazardous Substance.

"Equipment" means all equipment, machine tools, fixtures, tooling, furnishings, computer hardware, fixtures and other tangible personal property related to the Business, including the equipment and tangible personal property set forth in Schedule 5.6.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any other corporation or trade or business under common control with Seller or treated as a single employer with Seller as determined under Sections 414(b), (c), (m), or (o) of the Code.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" has the meaning set forth in Section 2.4.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Expense Reimbursement" has the meaning set forth in Section 7.3.

"Financial Statements" has the meaning set forth in Section 5.4(a).

"GAAP" means United States generally accepted accounting principles as used by Seller in the preparation of Financial Statements consistently applied with Seller's past practices.

"Governmental Authority" means any federal, state, local or foreign government, political subdivision or governmental or regulatory authority, agency, board, bureau, commission, instrumentality or court or quasi-governmental authority.

"Hazardous Substances" means any substance presently listed, defined, designated or classified as hazardous, toxic, radioactive or dangerous, or otherwise regulated, under any Environmental, Health and Safety Law. The term "Hazardous Substances" includes any substance to which exposure is regulated by any Governmental Authority or any Environmental,

Health and Safety Law including any toxic waste, pollutant, contaminant, hazardous substance, toxic substance, hazardous waste, special waste, petroleum or any derivative or by-product thereof, radon, radioactive material, asbestos or asbestos containing material, urea formaldehyde foam insulation, lead or polychlorinated biphenyls.

"Intangible Property" means all original concepts, ideas, works of authorship, data, designs, drawings, formulas, inventions, know-how, manufacturing know-how, methods, processes, procedures, plans, names, research records, service marks, service names, software, technical documentation, trademarks, technology, trade names, trade secrets, technologies and all intellectual property or proprietary property rights thereto, including all patents, patent applications, trademark registrations and applications, copyrights, copyright registrations and applications, which are filed, issued or exist (anywhere in the world), licenses and all other rights with respect thereto (including all rights in, to or related or associated in any manner with any of the foregoing or any aspect or part thereof whether owned or licensed, and all rights to sue for any past, present or future infringement of any of the foregoing rights and the right to all income, royalties, damages and payments now or hereafter due or payable with respect to any of the foregoing rights, including damages for past, present or future infringement thereof).

"Interim Statements" has the meaning set forth in Section 5.4(a)(iii).

"Interim Inventory Value" has the meaning set forth in Section 3.2.

"Inventory" means all inventory of raw materials, including scrap, remnants, work-in-progress, and finished goods of the Business.

"Koch" has the meaning set forth in Section 2.3.

"Law" or "Laws" means any and all federal, state, local or foreign statutes, laws, ordinances, proclamations, codes, regulations, Permits, approvals, consents, legal doctrines, published requirements, orders, decrees, judgments, injunctions and rules of any Governmental Authority, including those covering environmental, Tax, energy, safety, health, transportation, bribery, record keeping, zoning, discrimination, antitrust and wage and hour matters, in each case as amended and in effect from time to time.

"Licensed Intangible Property" means the Assigned Intangible Property licensed to Seller.

"Loss" or "Losses" means all liabilities, losses, claims, damages, actions, suits, proceedings, demands, assessments, adjustments, fees, costs and expenses (including reasonable attorneys' fees, expert witness fees and costs and expenses of investigation).

"MagRabbit" has the meaning set forth in Section 2.1(q).

"Mineral Rights" has the meaning set forth in Section 2.1(p).

"Necessary Consent" has the meaning set forth in Section 2.6.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment, or arbitration award of a Governmental Authority.

"Owned Intangible Property" means all Assigned Intangible Property in which Seller has an ownership interest.

"Permits" means licenses (other than licenses for the use of Intangible Property), franchises, permits, certificates of occupancy, approvals, entitlements, authorizations of transportation authorities, operating authorizations, titles (including motor vehicle titles and current registrations), certificates, test lines and qualifications related thereto and other governmental authorizations.

"Permitted Encumbrances" means Encumbrances for (a) property or ad valorem Taxes not yet due and payable or which are being contested in good faith and by appropriate proceedings if adequate reserves with respect thereto are maintained on Seller's books in accordance with GAAP, (b) obligations under operating and capital leases described in Schedule 5.6, and (c) minor imperfections of title that do not, either individually or in the aggregate, materially and adversely affect the use, enjoyment or value of the property to which such imperfections in title relate.

"Person" means an individual, partnership, corporation, business trust, limited liability company, limited liability partnership, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Petition Date" means the date on which the Petitions are filed.

"Petitions" has the meaning set forth in the recitals of this Agreement.

"Physical Inventory" has the meaning set forth in Section 8.1(b).

"PNC Bank" means PNC Bank, N.A.

"Pre-Closing Accounts Receivable" has the meaning set forth in Section 8.14.

"Products" means any and all products developed, manufactured, marketed, or sold by Seller.

"Property" means the real property portion of the Business Facilities.

"Purchase Price" has the meaning set forth in Section 3.1.

"Purchaser" has the meaning set forth in the preamble of this Agreement.

"Purchaser Ancillary Agreements" means each other certificate, agreement, document or instrument to be executed and delivered by Purchaser in connection with the transactions contemplated by this Agreement.

"Purchaser Representatives" means Purchaser's directors, officers, employees, Affiliates (and their directors, officers, officers and employees), representatives (including financial advisors, attorneys, and accountants) and agents and its potential sources of financing for the transactions contemplated by this Agreement.

"Real Estate Documents" means, with respect to the Business Facilities, (i) all existing environmental, engineering, soils, water, or other consulting reports and studies; (ii) assessments (special or otherwise), ad valorem and personal property tax bills for the 2008 calendar year and all subsequent years through the date hereof; (iii) the Service Contracts, (iv) the Permits, (v) any surveys of each of the Business Facilities, (vi) Seller's owner's policy of title insurance with respect to each Business Facility; (vii) all of Seller's insurance policies insuring the Business Facilities; (viii) a description of any pending litigation concerning the Business Facilities; and (ix) any other documents requested by Purchaser related to Seller's ownership, operation, or maintenance of the Business Facilities.

"Representatives" has the meaning set forth in Section 7.2(b).

"Sale Hearing" means the hearing in the Bankruptcy Court requesting authority to sell the Assets free and clear of Encumbrances to Purchaser or pursuant to a higher and better bid recommended by Seller.

"Sale Motion" has the meaning set forth in Section 7.1.

"Sale Order" means an order of the Bankruptcy Court pursuant to Sections 363, 365, and 1146(c) of the Bankruptcy Code, which is not subject to a stay pending appeal and is in form and substance acceptable to Purchaser, approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby. Without limiting the generality of the foregoing, such order shall (A) find, among other things, that (i) Purchaser has acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code and (ii) this Agreement was negotiated, proposed, and entered into by the parties without collusion, in good faith and from arm's length bargaining positions; and (B) provide, among other things, that (i) the Assets sold to Purchaser pursuant to this Agreement shall be transferred to Purchaser free and clear of all Encumbrances (other than Encumbrances created by Purchaser and other than Permitted Encumbrances) and claims; (ii) Purchaser will not be liable for any liabilities (including any Tax or COBRA liabilities) of Seller or relating to the Assets other than the Assumed Liabilities; (iii) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach hereof as provided in Section 12.9; and (iv) this Agreement and the transactions contemplated hereby may be specifically enforced against and binding upon, and not subject to rejection or avoidance by, Seller or any chapter 7 or chapter 11 trustee of Seller.

"Seller" and "Sellers" have the meanings set forth in the preamble of this Agreement.

"Seller Ancillary Agreements" means each other certificate, agreement, document, or instrument to be executed and delivered by Seller in connection with the transactions contemplated by this Agreement.

"Seller Material Adverse Effect" means any change (whether or not resulting from the occurrence of any event) that materially and adversely affects the properties, assets, business, prospects, or condition (financial or otherwise), of the Business.

"Seller Noncompete Term" means five years from the Closing Date.

"Seller's Knowledge" means the knowledge of the officers of Seller after due inquiry, and any knowledge that they would have been obtained after having made due inquiry of the appropriate employees of Seller and due review of the files and records of Seller.

"Service Contracts" means all of Seller's right, title, and interest, to the extent assignable, in all service agreements, maintenance contracts, equipment leasing agreements, warranties, guarantees, bonds and other Contracts for the provision of labor, services, materials, or supplies relating solely to the Business Facilities, together with all renewals, supplements, amendments and modifications thereof, and any new such agreements entered into after the Effective Date, to the extent permitted by this Agreement and to the extent those Service Contracts are designated by Purchaser or which Purchaser is obligated to assume pursuant to this Agreement.

"Solicitation Period" has the meaning set forth in Section 7.2(a).

"Southwest" has the meaning set forth in the preamble of this Agreement.

"Survey" has the meaning set forth in Section 8.2(c).

"Tax Return" means any return, declaration, report, claim for refund, information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Taxes" means all taxes, charges, fees, levies or other assessments including income, gross receipts, excise, property, sales, withholding, social security, unemployment, occupation, use, service, license, payroll, franchise, transfer and recording taxes, fees and charges, imposed by the United States or any state, local or foreign government or subdivision or agency thereof, whether computed on a separate, consolidated, unitary, combined or any other basis, including any interest, fines, penalties or additional amounts attributable to or imposed with respect to any such taxes, charges, fees, levies or other assessments, whether or not disputed.

"Termination Date" means the date on which this Agreement is terminated pursuant to Section 4.4.

"Territory" means anywhere within any geographic location in the State of Texas.

"Third Person" means any Person not a party to this Agreement.

"Title Commitment" has the meaning set forth in Section 8.2(b).

"Title Commitment Documents" has the meaning set forth in Section 8.2(b).

"Title Company" has the meaning set forth in Section 8.2(b).

"Title Policy" has the meaning set forth in Section 8.2(b).

"Transfer Taxes" has the meaning set forth in Section 11.1.

"Transferred Employees" has the meaning set forth in Section 8.12(b).

"Waiver Date" means the date, if any, on which a condition set forth in Section 10.1 shall be deemed to be waived by Purchaser.

"Weekly Budget" has the meaning set forth in Section 5.4(a)(iv).

"Weekly Financial Report" has the meaning set forth in Section 8.13.

"Wind-Up" has the meaning set forth in Section 8.9.

**1.2. Interpretation.** For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires: (a) the terms defined in Section 1.1 and elsewhere in this Agreement include the plural as well as the singular; (b) all accounting terms not otherwise defined herein have the meanings ascribed to them in accordance with GAAP; (c) all dollar amounts are expressed in United States funds; (d) a reference to one gender includes the other gender and the neuter; (e) the words "herein," "hereof," and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision; (f) the terms "include," "includes" and "including" are not limiting; and (g) the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."

# ARTICLE II
# THE PLAN OF ACQUISITION

**2.1. Acquisition of the Assets.** At the Closing and subject to the conditions set forth in this Agreement, Seller shall sell, convey, transfer, assign, and deliver to Purchaser, and Purchaser shall purchase from Seller, all of the assets, properties, businesses, franchises, goodwill, and rights of the Business of every kind and character, tangible or intangible, real or personal, whether owned or leased, including those set forth in this Section 2.1, specifically excluding the Excluded Assets (collectively, the "Assets"), free and clear of all Encumbrances other than Permitted Encumbrances. The Assets include the following:

(a)     the Inventory;

(b)     the Business Facilities;

(c)     all customer lists, sales records, customer payment histories and quality complaints or warranty claims;

(d)     all marketing materials relating to the Inventory or products manufactured by the Business, including (i) packaging therefor (including packaging on hand as of the Closing Date and packaging on order prior to the Closing Date), and (ii) to the extent relating to the Business, the information and content contained on the AIW Web Site;

(e)    all of Seller's purchase orders, orders in progress, and backlog of orders;

(f)    all supplier lists, files, records, and data related to the Business;

(g)    all deposits (including customer deposits and security deposits for rent, electricity, telephone, or otherwise) and prepaid charges and expenses of Seller, other than (i) deposits or prepaid charges and expenses to the extent paid in connection with or relating to any Excluded Assets and (ii) retainers paid by Seller to Langley & Banack, Inc. and BDO Seidman, LLP;

(h)    all supplies owned by Seller and used in connection with the Business;

(i)    all insurance policies or rights to proceeds thereof relating to the assets, properties, business or operations of Seller;

(j)    all right, title and interest of Seller in, to, and under all of the Assumed Contracts, including deposits paid in connection therewith;

(k)    all Equipment;

(l)    all Permits owned or possessed by Seller that relate to the Business or the Assets, including those listed in Schedule 5.9, all to the maximum extent assignable (the "Assigned Permits");

(m)    the Assigned Intangible Property, and all right, title and interest therein;

(n)    all rights of Seller under or pursuant to all warranties, representations, and guarantees made by suppliers, manufacturers, and contractors to the extent relating to Products sold, or services provided, to Seller or to the extent affecting any Assets other than any warranties, representations and guarantees pertaining to any Excluded Assets;

(o)    all rights of Seller with respect to unbilled retainage pursuant to Contracts with customers;

(p)    all of Seller's mineral rights associated with the Gato Creek prospect, consisting of 640 acres, more or less, J Poitevent Survey No 1003, A-1655, Webb County, Texas (the "Mineral Rights");

(q)    all of AIW's membership interest in MagRabbit-AIW, LLC, a Texas limited liability company ("MagRabbit"); and

(r)    all right, title and interest of Seller in, to and under all rights, privileges, claims, causes of actions and options related to the Assets.

**2.2.    Excluded Assets.**  Seller shall retain, and the Assets shall specifically not include, the following assets and other rights of Seller (collectively, the "Excluded Assets"):

(a)     all cash and cash equivalents;

(b)     all Accounts Receivable;

(c)     all refunds that may be due to Seller from the State of Texas with respect to a sales tax assessment paid by Seller to the State of Texas for the period May 2003 through July 2007;

(d)     all Contracts to which Seller is a party or any of its assets are subject which are not listed in Schedule 2.5;

(e)     any shares of capital stock or other equity interest of Seller or any securities convertible into, exchangeable, or exercisable for shares of capital stock or other equity interest of Seller; and

(f)     all Seller Employee Plans.

**2.3.    Other Assets.**  Schedule 2.3 sets forth the personal property of Tony Koch ("Koch") which are neither Assets nor Excluded Assets and shall be retained by Koch.

**2.4.    Assumed Liabilities; Excluded Liabilities.**  Except to the extent expressly provided in this Section 2.4, Purchaser will not assume, in connection with the transactions contemplated by this Agreement or otherwise, any liability or obligation of Seller whatsoever, and Seller will retain responsibility for, all liabilities and obligations accrued as of or on the Closing Date and all liabilities and obligations arising from Seller's operations (with respect to the Business or otherwise) prior to or on the Closing Date, whether actual or contingent and whether or not accrued or disclosed, including any Bankruptcy-Related Fees and all obligations of Seller under the DIP Credit Agreement (the "Excluded Liabilities").  As the sole exception to the provisions in this Section, effective as of the Closing Date, Purchaser shall assume and agree to pay, discharge or perform, as appropriate, the obligations of Seller under the Assumed Contracts, but only to the extent such obligations accrue after the Closing Date, are not required to be performed prior to the Closing Date and are apparent from the terms of such Assumed Contracts (collectively, the "Assumed Liabilities").

**2.5.    Assignment and Assumption of Contracts.**  Within four Business Days of the date hereof, Seller shall deliver to Purchaser a full and complete list of all Real Estate Documents, Service Contracts, and other Contracts to which Seller is a party or by which any of its assets are bound and shall have provided to Purchaser complete and correct copies of all such Real Estate Documents, Service Contracts, and other Contracts.  Within 25 days prior to the Auction Date, Purchaser shall deliver to Seller a full and complete list of all Real Estate Documents, Service Contracts, and other Contracts which Purchaser agrees to assume pursuant to the terms and conditions of this Agreement, which list shall be attached hereto as Schedule 2.5 (the "Assumed Contracts").  Seller shall assign all of its right, title, and interest in and to, and Purchaser shall assume, perform, and discharge all of Seller's remaining obligations under, the Assumed Contracts from and after the Closing Date.  Seller shall assume all amounts necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Assumed Contracts (the "Cure Amounts"), and Purchaser shall have no liability therefor.  Seller shall promptly satisfy all Cure Amounts.

**2.6. Non-Assignment of Assets.** Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not affect the assignment or transfer of any Asset if (a) an attempted assignment thereof, without the approval, authorization, or consent of, or granting or issuance of any license or permit by, any third party thereto (each such action, a "Necessary Consent"), would constitute a breach thereof or in any way adversely affect the rights of Purchaser thereunder, and (b) the Bankruptcy Court shall not have entered an Order providing that such Necessary Consent is not required. In such event, Seller and Purchaser shall use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Purchased Asset or any claim or right or any benefit arising thereunder for the assignment thereof to Purchaser as Purchaser may reasonably request. If such Necessary Consent is not obtained, or if an attempted assignment thereof would be ineffective or would adversely affect the rights of Seller thereunder so that Purchaser would not in fact receive all such rights, Seller and Purchaser shall cooperate in a mutually agreeable arrangement, to the extent feasible acknowledging that Seller will be effectively out of business after Closing and may terminate its existence, under which Purchaser would obtain to the extent possible the benefits and assume the obligations thereunder in accordance with this Agreement.

**2.7. Changes in Assumed Contracts.** At any time prior to 5:00 p.m., Dallas, Texas time, on the second Business Day prior to the date of the auction provided for in the Bidding Procedures Order (the "Auction Date"), Purchaser may (i) remove from Schedule 2.5 any Real Estate Document, Service Contract, or other Contract to which Seller is a party or (ii) designate other additional Excluded Assets by giving reasonably detailed written notice thereof to Seller. There shall be no adjustment in the Purchase Price as a result of Purchaser's election to remove a Real Estate Document, Service Contract, or other Contract from Schedule 2.5 or designate any other additional Excluded Assets. Notwithstanding any other provision hereof, the liabilities of Seller under or related to any Real Estate Document, Service Contract, or other Contract or additional Excluded Asset removed or excluded under this Section 2.7 shall constitute Excluded Liabilities.

**2.8. Schedules.**

(a)     Schedule 2.8(a) sets forth a list of the Schedules to this Agreement that shall be delivered by Seller concurrently with the execution of this Agreement. The parties hereto shall cooperate to finalize the Schedules to this Agreement after the date hereof in accordance with this Agreement.

(b)     No later than 12:00 noon, San Antonio, Texas time, on April 9, 2010, Seller shall deliver to Purchaser the Schedules to this Agreement, other than (i) Schedule 2.5 which shall be delivered and agreed to pursuant to Section 2.5 and (ii) the Schedules which have been delivered by Seller concurrently with the execution of this Agreement.

# ARTICLE III
# PURCHASE PRICE

**3.1. Purchase Price and Payment.** The Purchase Price (herein so called) for the Assets shall be equal to $8,000,000, as adjusted pursuant to Sections 3.2 and 3.3 (the "Closing Date Purchase Price"). On the Closing Date, Purchaser shall pay to Seller the Closing Date Purchase Price. Any cash required to be paid at the Closing will be paid by wire transfer of immediately available funds to an account or accounts specified by Seller.

**3.2. Inventory Adjustment.**

(a) If the book value of the Inventory on the day prior to the Closing (the "Closing Inventory Value") is less than the book value of the Inventory as of April 4, 2010, which amount is set forth on <u>Schedule 3.2</u>, based in each case on Seller's books and records (the "Interim Inventory Value"), then the Purchase Price shall be reduced on a dollar-for-dollar basis by an amount equal to the difference between the Closing Inventory Value and the Interim Inventory Value. If the Closing Inventory Value is more than the Interim Inventory Value, then the Purchase Price shall be increased on a dollar-for-dollar basis by an amount equal to the difference between the Closing Inventory Value and the Interim Inventory Value as a result of receipts in excess of shipments.

(b) If after the completion of the Physical Inventory pursuant to Section 8.1(b), Purchaser determines that the book value of the Inventory as of the date of completion of the Physical Inventory as determined by the Physical Inventory is more than 15% less than the book value of the Inventory as stated in Seller's books and records as of such date, then the Purchase Price shall be reduced by an amount equal to 60% of the dollar amount of such difference.

**3.3. Proration of Certain Items.** Real and ad valorem property taxes on the Assets will be apportioned at the Closing based upon the number of days in the taxable period before and after the Closing Date and the amounts set forth in the current tax bills if available or, if not available, based upon the amounts set forth in the most recent tax bills available. Utilities charges for the Business Facilities shall be apportioned based upon the number of operating days occurring before and after the Closing Date during the billing period for each such charge. The amount of such prorated items shall be added to or subtracted from, as the case may be, the Closing Date Purchase Price. Prepaid rents and deposits in respect of leases shall not be prorated hereunder, it being understood that such prepaid amounts constitute part of the Assets.

# ARTICLE IV
# CLOSING AND TERMINATION

**4.1. Closing Date.** Subject to the satisfaction of the conditions set forth in Sections 10.1, 10.2, and 10.3 (or the waiver thereof by the party entitled to waive that condition), the closing of transactions contemplated herein (the "Closing") shall take place at the offices of Langley & Banack, Inc. located at 745 E. Mulberry, Ninth Floor, San Antonio, Texas (or at such other place as the parties may designate in writing) at 10:00 a.m. (San Antonio, Texas time) on the third Business Day following the day on which the conditions set forth in ARTICLE

X (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions) are satisfied or waived, unless another time or date, or both, are agreed to in writing by the parties hereto. The date on which the Closing occurs is referred to in this Agreement as the "Closing Date."

**4.2. Deliveries by Seller.** At the Closing, Seller shall deliver to Purchaser:

(a) one or more duly executed bills of sale in a form to be agreed upon by the parties hereto;

(b) one or more duly executed assignment and assumption agreements in a form to be agreed upon the parties hereto and duly executed assignments of the U.S. trademark registrations and applications included in the Assigned Intangible Property, in a form suitable for recording in the U.S. Patent and Trademark Office;

(c) special warranty deeds conveying the Business Facilities and the Mineral Rights in a form to be agreed upon by the parties hereto;

(d) the officer's certificates required to be delivered pursuant to Sections 10.1(a) and 10.1(b);

(e) affidavits executed by Seller that Seller is not a foreign person within the meaning of Section 1445(b)(3) of the Code, sworn under penalty of perjury in form and substance required under Treasury Regulations issued pursuant to Section 1445 of the Code; and

(f) all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Assets to Purchaser.

**4.3. Deliveries by Purchaser.** At the Closing, Purchaser shall deliver to Seller:

(a) the Closing Date Purchase Price;

(b) one or more duly executed assignment and assumption agreements in a form to be agreed upon the parties hereto; and

(c) the officer's certificates required to be delivered pursuant to Sections 10.2(a) and 10.2(b).

**4.4. Termination of Agreement.** This Agreement may be terminated prior to the Closing as follows:

(a) by Purchaser, if the Closing shall not have occurred by the close of business on the 70th day after the Petition Date; provided, however, that if the Closing shall not have occurred on or before such date due to the breach of Purchaser of its obligations under this Agreement, then Purchaser may not terminate this Agreement pursuant to this Section 4.4(a);

(b) by mutual written consent of Seller and Purchaser;

(c) by Purchaser, if any condition to the obligations of Purchaser set forth in

Section 10.1 or 10.3 shall have become incapable of fulfillment prior to the earlier of the Closing Date or the Waiver Date applicable thereto, if any, other than as a result of a breach by Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser;

(d)     by Purchaser on or prior to the close of business on the seventh day after the date Seller delivers to Purchaser all of the Schedules required to be delivered pursuant to Section 2.8(b), based on its review of any information related to Seller, the Assets, or the Business set forth in any Schedules to this Agreement;

(e)     by Seller, if there shall be a breach by Purchaser of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 10.2 or 10.3 and which breach has not been cured by the earlier of (i) 10 Business Days after the giving of written notice by Seller to Purchaser of such breach and (ii) the 70th day after the Petition Date;

(f)     by Purchaser, if Seller shall file a plan of reorganization or liquidation or enter into a Contract with respect to a Competing Transaction or if the Bankruptcy Court shall enter an order approving a Competing Transaction;

(g)     automatically, if Seller consummates a Competing Transaction;

(h)     by Purchaser, if

(i)     Seller does not file the Petitions and the Sale Motion with the Bankruptcy Court within two Business Days after the date hereof;

(ii)     the Bidding Procedures Order is not entered on or before the 10th day after the Petition Date; or

(iii)     a Sale Order is not entered on or before the 55th day after the Petition Date; or

(i)     by Purchaser, if the Bankruptcy Case is dismissed or converted into a case under Chapter 7 of the Bankruptcy Code or if a trustee or examiner is appointed in the Bankruptcy Case.

**4.5.     Procedure Upon Termination.**   In the event of termination pursuant to Section 4.4, written notice thereof shall forthwith be given to the other party or parties, and this Agreement shall terminate, and the purchase of the Assets hereunder shall be abandoned, without further action by Purchaser or Seller.  If this Agreement is terminated as provided herein, each party shall redeliver all documents, work papers, and other material of any other party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the party furnishing the same.

**4.6.     Effect of Termination.**   If this Agreement is validly terminated as provided herein, each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to

Purchaser or Seller; provided, however, that the obligations of the parties set forth in Section 7.3 and the provisions of ARTICLE XII shall survive any such termination and shall be enforceable hereunder

# ARTICLE V
# REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Purchaser as follows:

**5.1. Due Organization and Qualification.** Each Seller is an entity duly organized, validly existing and in good standing under the laws of Texas and, subject to the limitations imposed on such Seller as a result of having filed a petition for relief under the Bankruptcy Code, has the requisite power and authority to own, lease, and operate the Assets and to carry on the Business as now conducted.

**5.2. Authorization; Non-Contravention; Approvals.**

(a) Subject to entry of the Bidding Procedures Order and the Sale Order and such other authorization as is required by the Bankruptcy Court, each Seller has the requisite power and authority to execute and deliver this Agreement and each Seller Ancillary Agreement and to perform its respective obligations hereunder and thereunder. Subject to entry of the Bidding Procedures Order and the Sale Order and such other authorization as is required by the Bankruptcy Court, the execution and delivery of this Agreement and each Seller Ancillary Agreement and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of each Seller. This Agreement and each Seller Ancillary Agreement has been duly and validly executed and delivered by each Seller, and (assuming the due authorization, execution, and delivery by the other parties hereto, the entry of the Sale Order, and, with respect to Seller's obligations under Section 7.3, the entry of the Bidding Procedures Order) this Agreement and each Seller Ancillary Agreement constitutes legal, valid, and binding obligation of each Seller enforceable against such Seller in accordance with its respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith, and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

(b) The execution and delivery of this Agreement by Seller does not, and the execution and delivery of the Seller Ancillary Agreements by Seller will not, and the consummation by Seller of the transactions contemplated hereby and thereby will not, violate or result in a breach of any provision of, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, or result in the termination of, or accelerate the performance required by, or result in a right of termination or acceleration under, or result in the creation of any Encumbrance upon any of the properties or assets of Seller under any of the terms, conditions or provisions of (i) the Articles of Incorporation, Bylaws, Articles of Organization, and Agreement of Limited Partnership of Seller, (ii) any Laws applicable to Seller of any of its properties or assets, or (iii) subject to entry of the Sale Order, any note, bond, mortgage, indenture, deed of trust, Permit, concession, lease or other instrument, obligation or agreement of any kind to which Seller is now a party or by which Seller or any of its properties or assets may be bound or affected or any decree of court or administrative agency.

(c)    Except as set forth in <u>Schedule 5.2(c)</u> and except to the extent not required if the Sale Order is entered, no consent, waiver, approval, Order, Permit, or authorization of or declaration or filing with, or notification to, any Governmental Authority or Third Person is required on the part of Seller in connection with the execution and delivery of this Agreement or any Seller Ancillary Agreement, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, or the taking by Seller of any other action contemplated hereby or thereby, except for (i) the entry of the Sale Order and (ii) the entry of the Bidding Procedures Order with respect to Seller's obligations under Section 7.3.

**5.3.    Subsidiaries.**  Except for the ownership by AIW of 490,000 membership units in MagRabbit, Seller does not own, of record or beneficially, or control, directly or indirectly, any capital stock, securities convertible into or exchangeable for capital stock or any other equity interest in, or otherwise participate or have an interest, in any Person related in any way to the Assets or the Business.

**5.4.    Financial Information.**

(a)    Seller has delivered to Purchaser complete and correct copies of the following financial information:

(i)    the audited, consolidated balance sheet of AIW and its subsidiaries as of December 31, 2008, and the related audited statements of income, cash flows, and changes in shareholders' equity for the 12-month period then ended, together with the notes thereto and the report of the Company's independent auditors thereon (the "2008 Financial Statements");

(ii)    the unaudited, consolidated balance sheet of AIW and Southwest and AIW's subsidiaries as of December 31, 2009, and the related unaudited statements of income, cash flows, and changes in shareholders' equity for the 12-month period then ended (the "2009 Financial Statements");

(iii)    the unaudited, consolidated interim balance sheet of AIW and Southwest and AIW's subsidiaries as of February 28, 2010, and the related unaudited statements of income, cash flows, and changes in shareholders' equity for the two-month period then ended (the "Interim Statements" and together with the 2008 Financial Statements and the 2009 Financial Statements, collectively, the "Financial Statements"); and

(iv)    the Weekly Cash Flow and Residual Operations Projections for AIW and Southwest for the 18 weeks ended August 6, 2010, a copy of which is attached hereto as <u>Exhibit B</u> (the "Weekly Budget").

(b)    The Financial Statements have been prepared from the books and records of Seller.  The Weekly Budget has been prepared using selected information from the books and records of Seller and selected current financial information, determined by Seller to be necessary to provide estimates of financial performance.  The Financial Statements (but not the Weekly Budget) have been prepared in conformity with GAAP,

except, in the case of the unaudited statements, for the absence of footnotes and other presentation items, and in the case of the interim unaudited statements, for normal year-end adjustments. The Financial Statements present fairly the financial position of the Business, as of the dates thereof and for the periods covered thereby. The Weekly Budget presents fairly the information contained therein, has been prepared in good faith by Seller based upon reasonable assumptions, and represents Seller's best good faith estimates of Seller's future financial performance. The books of account of the Business have been kept accurately in all material respects in the ordinary course of business, the transactions entered therein represent bona fide transactions and the revenues, expenses, assets and liabilities of the Business have been properly recorded therein in all material respects.

**5.5. Liabilities and Obligations.** Except as set forth in Schedule 5.5, as of the Balance Sheet Date, Seller did not have, nor has it incurred since the Balance Sheet Date, with respect to the Business or the Assets, any liabilities or obligations (whether absolute, accrued, contingent or otherwise) of any nature that are required by GAAP to be reflected, accrued or reserved against on a balance sheet except liabilities, obligations or contingencies (a) that are accrued or reserved against or reflected in the Financial Statements, or (b) that were incurred after the Balance Sheet Date in the ordinary course of business, consistent with past practices. Schedule 5.5 contains a reasonable estimate by Seller of the maximum amount that may be payable with respect to known contingent liabilities with respect to the Business or the Assets that are not accrued, reserved or reflected in the Financial Statements, and a summary description of each such liability, together with copies of all relevant documentation relating thereto.

**5.6. Assets.**

(a) Seller owns and has good and marketable title to the Assets, free and clear of all Encumbrances other than Permitted Encumbrances and a second priority lien held by Koch on the 126 Gonzales Street Property, which at Closing shall be released against the 126 Gonzales Street Property and transferred to the proceeds only if all of the obligations (both pre-bankruptcy obligations and post-bankruptcy obligations) owed by Seller to PNC Bank are paid in full, subject to a reserve established in accordance with the Bidding Procedures Order, in its existing priority and validity. At Closing, and subject to the Sale Order, Purchaser shall receive good and marketable title to the Assets, free and clear of all Encumbrances other than Permitted Encumbrances. Purchaser acknowledges and agrees that, except for the representations, warranties, and covenants contained therein, the Assets are being transferred on a "where is" and, as to condition, "as is" basis

(b) Schedule 5.6 sets forth all of the Equipment which is material to Seller's operation of the Business and designates the Equipment which is owned by Seller and the Equipment which is leased or subleased by Seller pursuant to leases or subleases listed in Schedule 5.6.

(c) Subject to Schedule 2.5 containing all of the Contracts which are material to the Business, the Assets constitute all of the property (tangible and intangible) used in,

and necessary to operate, the Business in the manner conducted as of the Balance Sheet Date and the date of this Agreement.

(d)     Seller has delivered to Purchaser true, complete and correct copies of (i) all leases and subleases for the Equipment, (ii) descriptions of the real property included in the Business Facilities, and (iii) all title reports and title insurance policies received or owned by Seller pertaining to the Business Facilities.

(e)     All leases and subleases listed in Schedule 2.5 are in full force and effect and constitute valid and binding agreements of Seller and, to the knowledge of Seller, the other parties thereto in accordance with their respective terms, and neither Seller nor, to Seller's Knowledge, any other party thereto is in default or breach thereunder nor has received any notice of any default thereunder. None of such leases or subleases have been modified or amended and no sublease agreement or assignment has been entered into by Seller with respect to any such leases or subleases. Except with respect to consents set forth in Schedule 5.2(c), no approval or consent of any Person is needed to transfer such leases and subleases to Purchaser as contemplated hereby, and such leases and subleases will not become unenforceable by Seller or Purchaser as a result of the transfer thereof to Purchaser or the consummation of the transactions contemplated hereby. Such leasehold interests are subject to no Encumbrances other than Permitted Encumbrances, and Seller enjoys, in respect of such leases and subleases wherein Seller is lessee or sublessee, a right of quiet possession as against all Persons and Encumbrances other than Permitted Encumbrances.

(f)     (i) There are no Third Persons in possession of any portion of the Business Facilities as lessees, tenants at sufferance, trespassers or otherwise, (ii) there is no pending or, to Seller's Knowledge, threatened condemnation or similar proceeding or assessment affecting all or any part of the Business Facilities, (iii) there are water, sewer, gas and electricity lines (that, to the knowledge of Seller, comply with all applicable Laws) over public rights-of-way or private easements duly recorded and appurtenant to the Business Facilities that are available and reasonably sufficient for service on the Business Facilities with respect to the conduct of the Business, (iv) the Business Facilities do not violate in any material respect any applicable Laws, (v) the Business Facilities are not located in a flood plain designated by the Federal Energy Management Agency or any other Governmental Authority, (vi) the Business Facilities have direct access over public rights-of-way or private easements duly recorded and appurtenant to the Business Facilities to and from public highways, streets or roads and there is not pending or, to Seller's Knowledge, threatened proceeding by any Governmental Authority that would impair or result in the termination of such access, (vii) all buildings, improvements and fixtures situated on the Business Facilities conform to all Laws, (viii) the Business Facilities are zoned for the purposes for which they are being used, and there exists no proceeding or court order, or building code provision, deed restriction or restrictive covenant (recorded or otherwise) or other private or public limitation, which might in any way impede or adversely affect the continued use of the Business Facilities in the manner they are currently used, and (ix) the buildings, improvements and fixtures situated on the Business Facilities are in good condition and repair (excepting ordinary wear and tear and minor maintenance and repair

problems which would normally be associated with such assets when used in connection with the operation of the Business), free of any latent or patent structural defects.

## 5.7. Contracts.

(a)     Except to the extent set forth in <u>Schedule 5.7(b)</u> and subject to the entry of the Bidding Procedures Order and the Sale Order and such other authorization as is required by the Bankruptcy Court, each Assumed Contract is a valid and binding agreement of the parties thereto enforceable against them in accordance with its terms. No event has occurred which, with the passage of time or the giving of notice, or both, would constitute a default under or a violation of any such Assumed Contract or would cause the acceleration of any obligation under such Assumed Contract or, to the knowledge of Seller, any other party thereto or the creation of a Encumbrance upon any Asset, except for such events that will be cured in accordance with the Bidding Procedures Order, the Sale Order or such other authorization as is required by the Bankruptcy Court. Except as set forth in <u>Schedule 5.7(b)</u>, Seller has not received any notice from, or given any notice to, any Third Person indicating that Seller or such Third Person is in breach of or in default under any Assumed Contract. To the knowledge of Seller, no other party to any Assumed Contract is in breach of or in default thereunder, nor has any assertion been made by Seller of any such breach or default. Purchaser recognizes that certain of the Contracts with Governmental Authorities may be small business set-asides and cannot be assumed by their terms, provided that Seller shall provide reasonable assistance to Purchaser in the assignment of such Contracts pursuant to Section 2.6.

(b)     Except to the extent set forth in <u>Schedule 5.7(b)</u>, Seller is not a party to any governmental Contracts related to the Business subject to price redetermination or renegotiation. Seller is not required to provide any bonding or other financial security arrangements in any material amount in connection with any transactions of the Business with any of its customers or suppliers or otherwise related to the Business.

## 5.8. Inventory.
All Inventory, whether or not reflected on the Financial Statements or subsequently acquired, (a) is now and at the Closing Date will be located at the Business Facilities, (b) has been or will be acquired by Seller only in bona fide transactions entered into in the ordinary course of business, (c) is of good and merchantable quality except to the extent consistent with past practices, and (d) is valued at cost. Seller has now and on the Closing Date will have valid legal title to its Inventory free and clear of any Encumbrances, other than Permitted Encumbrances.

## 5.9. Permits.
<u>Schedule 5.9</u> contains a list of all Assigned Permits, all of which Assigned Permits are valid, and Seller has not received any written notice that any Governmental Authority intends to cancel, terminate or not renew any such Assigned Permit. The Assigned Permits are all the Permits that are required by Law for the Business as conducted at the Balance Sheet Date and the ownership of the assets of Seller related to the Business. Seller has for the past two years conducted, and is conducting, the Business in compliance with the requirements, standards, criteria and conditions set forth in such Assigned Permits, as well as the applicable orders, approvals and variances related thereto, and is not in violation of any of the foregoing. Except as specifically provided in <u>Schedule 5.9</u>, the transactions contemplated by this Agreement

will not result in a default under or a breach or violation of, or adversely affect the rights and benefits afforded to Seller by, any Assigned Permits.

**5.10. Environmental Matters.** Except as set forth in Schedule 5.10 or as may be disclosed in any environmental site assessments, audits or reports obtained by Purchaser prior to the Closing in connection with the transactions contemplated herein: (a) Seller has operated the Business, and the Business is, in compliance in all material respects with all Environmental, Health and Safety Laws; (b) Seller has obtained and is in compliance in all material respects with all necessary Permits and other approvals necessary to operate the Business and to treat, transport, store, dispose of, and otherwise handle Hazardous Substances and such Permits and other approvals are fully transferable to Purchaser; (c) there have been no "releases" or threats of "releases" (as defined in any Environmental, Health and Safety Laws) of Hazardous Substances at, from, in or on the Business Facilities; (d) there is no on-site or off-site location to which Seller or any of its Affiliates has transported or disposed of Hazardous Substances from the Business Facilities or arranged for the transportation or disposal of Hazardous Substances from the Business Facilities that is or, to Seller's Knowledge, is threatened to be the subject of any federal, state, local, or foreign enforcement action or any other investigation that could lead to any claim against Seller or Purchaser for any clean-up cost, remedial work, damage to natural resources, property damage or personal injury, including any claim under any Environmental, Health and Safety Law; (e) Seller, and any Third Person for whose conduct it is or may be held responsible, has not (i) entered into or been subject to any consent decree, compliance order or administrative order with respect to the Business Facilities or operations thereon, (ii) received notice under the citizen suit provision of any Environmental, Health and Safety Law in connection with the Business Facilities or operations thereon, (iii) received any request for information, notice, demand letter, administrative inquiry or formal or information complaint or claim with respect to any Hazardous Substances relating to the Business Facilities or operations thereon, or (iv) been subject to or threatened with any governmental or citizen enforcement action with respect to the Business Facilities or operations thereon; and (f) Seller and its Affiliates have no contingent liability in connection with any release or disposal of any Hazardous Substance from the Business Facilities into the environment. The Business Facilities are not currently nor have they ever been designated as a treatment, storage, and/or disposal facility, nor has any Permit from a Governmental Authority been applied for designating the Business Facilities as a treatment, storage, or disposal facility under any Environmental, Health and Safety Law. Seller has delivered to Purchaser true, correct and complete copies of all environmental audits (including any "Phase I" and/or "Phase II" site assessments) prepared by or on behalf of Seller or its Affiliates or otherwise in the possession of Seller or any of its Affiliates relating to the Business Facilities.

**5.11. Labor and Employee Relations.** Seller is not bound by or subject to any arrangement with any labor union. No Business Employees are represented by any labor union or covered by any collective bargaining agreement nor, to Seller's Knowledge, is any campaign to establish such representation in progress. There is no pending or, to Seller's Knowledge, threatened labor dispute involving the Business and any of its employees nor has the Business experienced any significant labor interruptions over the past five years. There are no pending or, to Seller's Knowledge, threatened labor disputes or other material issues in connection with the relationship between the Business and the Business Employees.

**5.12. Insurance.** Schedule 5.12 sets forth a list and brief description of all policies of fire, liability, casualty, life, and other insurance owned or held by Seller with respect to the Assets, the Business or the Business Employees. No event has occurred nor does any fact or condition exist which would render any of such policies void or voidable or subject any of such policies to cancellation or termination.

**5.13. Compensation; Employment Agreements.** Seller has delivered to Purchaser prior to the date hereof an accurate schedule of all Business Employees, listing the accrued vacation time of each such employee and their rate of compensation (and the portions thereof attributable to salary, bonus, benefits and other compensation, respectively) as of the date of this Agreement. Schedule 5.13 sets forth a complete and accurate list of all employee benefits made available to Business Employees. Except as set forth on Schedule 5.13, there are no Contracts between Seller and any Business Employee, nor is any officer, director, stockholder, member or Business Employee entitled to any severance, "golden parachute" or other similar payment.

**5.14. Noncompetition, Confidentiality and Nonsolicitation Agreements.** Schedule 5.14 sets forth a list of all agreements containing covenants not to compete or solicit employees or to maintain the confidentiality of information under which Seller has any rights or obligations related to the Business.

**5.15. Employee Benefit Plans.**

(a)     Subject to Section 8.12(e), all Employee Plans related to the Business or the Business Employees are being, and have been maintained, operated and administered, in accordance with their respective terms and in compliance with all applicable Laws.

(b)     No lien has been filed by any Person and no lien exists by operation of law or otherwise on the assets of Seller related to the Business relating to, or as a result of, the operation or maintenance of any Employee Plan by Seller or any ERISA Affiliate, and neither Seller nor any ERISA Affiliate has any knowledge of the existence of facts or circumstances that would reasonably be expected to result in the imposition of such lien.

(c)     Purchaser will incur no liability, cost or expense arising from, or with respect to, any Employee Plan or any other similar plan or arrangement currently or previously maintained, or contributed to, by Seller or any ERISA Affiliate.

(d)     Each Employee Plan may be terminated at any time without any liability, cost or expense to Purchaser.

**5.16. Litigation and Compliance with Law.** Except as set forth in Schedule 5.16, there are no claims, actions, suits, or proceedings, pending or, to the knowledge of Seller, threatened against or affecting the Assets, the Business, or Seller with respect to the Business, at law or in equity, or before or by any Governmental Authority. Except to the extent set forth in Schedule 5.16, Seller has conducted, and is now conducting, the Business in compliance with all Laws applicable to Seller, the Business, or the assets related to the Business.

**5.17. Taxes.** All Tax Returns required to be filed with any taxing authority by Seller as of the date hereof and the Closing Date have been or will be properly and timely filed when due

in accordance with all applicable Laws, and all such Tax Returns were correct and complete in all respects when previously filed or when filed between the date hereof and Closing. Seller has paid, or made adequate provision for payment of, all Taxes owed by Seller (whether or not shown on any Tax Return). Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any Third Person that required withholding under applicable Law, and all estimated Taxes of Seller required to be paid prior to Closing for the current taxable year of Seller will have been made as of the Closing Date. Except as set forth in Schedule 5.17, there is no Tax deficiency or delinquency asserted or threatened against Seller and no audit, action or similar proceeding is pending or threatened by any taxing authority against Seller. Except as set forth in Schedule 5.17, Seller has received no notice of any claim for Taxes, whether pending or threatened. Seller currently is not the beneficiary of any extension of time within which to file any Tax Return and has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency. No claim has ever been made by an authority in a jurisdiction where Seller does not file Tax Returns that it is or may be subject to taxation by that jurisdiction with respect to the Business. There are no security interests on any of the assets of any of Seller that arose in connection with any failure (or alleged failure) to pay any Tax.

**5.18. Absence of Changes.** Since the Balance Sheet Date, except as set forth in Schedule 5.18, there has not been:

(a) any Seller Material Adverse Effect;

(b) any increase in the compensation payable or to become payable by Seller to any employee, consultant or agent of the Business, except for ordinary and customary bonuses and salary increases for employees in accordance with past practice, which bonuses and salary increases are reflected in the compensation information set forth in Schedule 5.13;

(c) any significant work interruptions, labor grievances or claims filed with respect to the Business;

(d) any sale or transfer, or any agreement to sell or transfer, any material assets, properties or rights of the Business, or any interest therein, to any Person other than Purchaser;

(e) any purchase or acquisition of, or agreement, plan or arrangement to purchase or acquire, any property, rights, or assets related to the Business other than in the ordinary course of the Business;

(f) any waiver of any material rights or claims of Seller related to the Business; or

(g) any material breach, amendment, or termination of any Assumed Contract, Permit, or other right related to the Business or to which any of the Business's property is subject.

**5.19.  Absence of Certain Business Practices.**  Neither Seller nor any of its Affiliates has given or offered to give anything of value to any governmental official, political party, or candidate for government office that was illegal to give or offer to give nor has it otherwise taken any action which would constitute a violation of the Foreign Corrupt Practices Act of 1977, as amended, or any similar Law.

**5.20.  Competing Lines of Business; Related-Party Transactions.**  Except as set forth in Schedule 5.20, neither Seller nor any Affiliate of Seller owns, directly or indirectly, any interest in, or is an officer, director, employee, or consultant of or otherwise receives remuneration from any Affiliate of Seller or any business which is a lessor, lessee, customer, or supplier of the Business.  Except as set forth in Schedule 5.20, no officer or director of Seller or any Affiliate of Seller has any interest in any property, real or personal, tangible or intangible, used in or pertaining to the Business. Purchaser is aware that Alaron Supply Company, Inc. and Advo Supply Company, Inc. do work that is competing with AIW and that such entities are owned in part or whole by relatives of Koch, and such condition does not violate this Agreement.

**5.21.  Intangible Property.**

(a)  The Assigned Intangible Property is listed in Schedule 5.21, and Schedule 5.21 sets forth which of the Assigned Intangible Property is owned by Seller or for which a license has been granted to Seller with respect to its use.  Seller owns or is properly licensed to use all of the Assigned Intangible Property. The Assigned Intangible Property constitutes all of the Intangible Property necessary or desirable to operate the Business in the manner conducted as of the date of this Agreement.  To the knowledge of Seller, all of the Assigned Intellectual Property is valid and enforceable, to the extent such concept is applicable.

(b)  Seller possesses all right, title, and interest in and to all of the Owned Intangible Property, free and clear of any Encumbrances, other than Permitted Encumbrances, or other ownership interest of any Third Person.  Except as set forth in Schedule 5.21, Seller has not granted to any Person or obligated itself to grant to any Person any license, option, or other right in or with respect to any of the Owned Intangible Property or Licensed Intangible Property, whether or not requiring payment to Seller.  No Person has either asserted any rights in or offered to grant a license or any other right of use with respect to the Owned Intangible Property.  Seller has no obligation to compensate any Person for any development, license, use, sale, distribution, or modification of any of the Owned Intangible Property.  None of the Owned Intangible Property was developed as part of the performance of any obligation for any Person other than Seller which would require the taking of any action, whether or not actually taken, in order for all rights to the Owned Intangible Property to become vested in or retained by Seller.

(c)  Neither Seller, nor, to the knowledge of Seller, any Third Person, is in breach of or default under any license, contract, or legal requirement relating to the Owned Intangible Property or the Licensed Intangible Property and there is no restriction on transferring the Licensed Intangible Property to Purchaser.  Each license of the Assigned Intangible Property to which Seller is a party is now, and will be in the

foreseeable future (through the termination date set forth therein), valid and in full force and effect.

(d)    The operation of the Business in the manner currently operated by Seller, as well as the development, license, use, sale, distribution, modification, or other exploitation of the Assigned Intangible Property, does not infringe or violate, and has not infringed on or otherwise violated, the rights of any Third Person, including Intangible Property rights, or constitute an unlawful disclosure, use or misappropriation of the right or rights, including Intangible Property rights, of any Third Person.

(e)    There is no suit, action, complaint, proceeding, opposition, petition to cancel, interference, re-examination, or audit pending or, to the knowledge of Seller, threatened, with respect to: (i) the Assigned Intangible Property; or (ii) any right of Seller to develop, license, use, sell, distribute, or modify the Assigned Intangible Property.

(f)    Except as set forth in Schedule 5.21, Seller does not operate or control, with respect to the Business, either directly or indirectly, any Internet site that uses any trade names, trademarks or service marks of any Third Person, or any confusingly similar variation thereof, in any part of the Internet site, including in metatags or in hidden text.

**5.22.  Customers and Suppliers.**  Schedule 5.22 sets forth a true, complete, and correct list of the Business's 20 largest customers and 20 largest suppliers for the 12-month period ending on the Balance Sheet Date.  As of the date hereof, Seller has not received any written indication from any supplier listed on Schedule 5.22 to the effect that such supplier will stop, or materially decrease the rate of, supplying materials, products, or services to the Business.  Seller has not received any written indication from any customer listed on Schedule 5.22 to the effect that such customer will stop, or materially decrease the rate of buying materials, products, or services from the Business.

**5.23.  Accuracy of Information.**  The representations and warranties of Seller herein and the information furnished to Purchaser by Seller are true, correct, and complete in all material respects and states all, and does not omit to state any, material facts required to be stated therein or necessary to make the statements therein, in light of the circumstances under which such statements are made, true, correct, and complete in all material respects and not false or misleading in any material respect.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as follows:

**6.1.    Organization.**  Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware.

**6.2.    Authorization; Non-Contravention; Approvals.**

(a)     Purchaser has the full legal right, power and authority to enter into this Agreement and each of the other Purchaser Ancillary Agreements and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement and the Purchaser Ancillary Agreements have been approved by the managers of Purchaser. No additional limited liability company proceedings on the part of Purchaser are necessary to authorize the execution and delivery of this Agreement and the other Purchaser Ancillary Agreements and the consummation by Purchaser of the transactions contemplated hereby and thereby. This Agreement has been duly and validly executed and delivered by Purchaser and constitutes, and each of the Purchaser Ancillary Agreements when executed and delivered by Purchaser will be duly and validly executed and delivered by Purchaser and will constitute, in each case assuming the due authorization, execution and delivery hereof and thereof by Seller, valid and binding agreements of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to (i) bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting or relating to the enforcement of creditors' rights generally, and (ii) general equitable principles.

(b)     The execution and delivery of this Agreement by Purchaser does not, and the execution and delivery of the Purchaser Ancillary Agreements by Purchaser will not, and the consummation by Purchaser of the transactions contemplated hereby and thereby will not, violate or result in a breach of any provision of, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, or result in the termination of, or accelerate the performance required by, or result in a right of termination or acceleration under any of the terms, conditions, or provisions of (i) the Certificate of Formation or Operating Agreement of Purchaser or (ii) any Law applicable to Purchaser or any of its properties or assets.

(c)     Except for the entry of the Sale Order, no declaration, filing or registration with, or notice to, or authorization, consent or approval of, any Governmental Authority or Third Person is necessary for the execution and delivery of this Agreement and the Purchaser Ancillary Agreements by Purchaser or the consummation by Purchaser of the transactions contemplated hereby and thereby.

## ARTICLE VII
## BANKRUPTCY COURT MATTERS

**7.1.   Bankruptcy Court Filings.** On or before the second Business Day after the date hereof, Seller shall file with the Bankruptcy Court the Petitions and a motion seeking entry of the Sale Order and the Bidding Procedures Order (the "Sale Motion"), and, subject to Section 7.2, Seller shall thereafter pursue diligently the entry of the Sale Order and the Bidding Procedures Order. Seller shall use commercially reasonable efforts to comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure in connection with obtaining approval of the Sale Order and the Bidding Procedures Order, including serving on all required Persons in the Bankruptcy Case (including (i) all Persons who are known to possess or assert an Encumbrance against any of the Assets, (ii) all Governmental Authorities, and (iii) all other Persons required by any order of the Bankruptcy Court (including any omnibus notice or case

management order entered in the Bankruptcy Case), notice of the Sale Motion, the Sale Hearing, and the objection deadline in accordance with rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure, the Bidding Procedures Order, or other orders of the Bankruptcy Court, including any applicable local rules of the Bankruptcy Court. Purchaser shall promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and the Bidding Procedures Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. If the Sale Order or the Bidding Procedures Order is appealed, Seller and Purchaser shall use their respective reasonable efforts to defend such appeal. This Agreement and the transactions contemplated herein are subject to the approval of this Agreement by the Bankruptcy Court pursuant to the Bidding Procedures Order or other order of the Bankruptcy Court.

**7.2.    Competing Transactions.**

(a)    From and after the entry of the Bidding Procedures Order until the Auction Date (the "Solicitation Period"), Seller shall be permitted to cause its representatives and Affiliates to initiate contact with, or solicit or encourage submission of any inquiries, proposals, or offers by, any Person (in addition to Purchaser and its Affiliates, agents and representatives) with respect to any transaction (or series of transactions) involving the direct or indirect sale, transfer, or other disposition of a material portion of the Assets to a purchaser or purchasers other than Purchaser or effecting any other transaction (including a plan of reorganization or liquidation, but excluding a liquidation pursuant to chapter 7 of the Bankruptcy Code) the consummation of which would be substantially inconsistent with the transactions herein contemplated (a "Competing Transaction") to the extent, but only to the extent, that Seller determines in good faith that so doing is permitted or required by the Bidding Procedures Order. Following the Auction Date, Seller shall not participate in any discussions with, or furnish any information to, any Person with respect to any Competing Transaction regardless of the terms thereof.

(b)    Except during the Solicitation Period, Seller shall not, and shall not permit any of its partners, directors, officers, employees, representatives or agents (collectively, the "Representatives") to, directly or indirectly, (i) discuss, encourage, facilitate, negotiate, undertake, initiate, solicit, authorize, propose, or enter into a Competing Transaction or Acquisition Proposal or (ii) furnish or cause to be furnished, to any Person, any information covering the business, properties, or assets of Seller in connection with a Competing Transaction or Acquisition Proposal.

**7.3.    Break-Up Fee and Expense Reimbursement.**  If this Agreement is terminated pursuant to any subparagraph of Section 4.4 other than Section 4.4(b) or Section 4.4(e), Purchaser shall be entitled to (a) reimbursement from Seller of up to $60,000 of expenses incurred by Purchaser in connection herewith, whether or not such expenses are incurred prior to or after the date hereof (the "Expense Reimbursement"), and (b) payment from Seller of a cash amount equal to $240,000 (the "Break-Up Fee"). The Expense Reimbursement and the Break-Up Fee shall be paid on the Termination Date. Seller acknowledges and agrees that (i) the payment of the Break-Up Fee and the Expense Reimbursement are integral parts of the

transactions contemplated by this Agreement, (ii) in the absence of Seller's obligations to make these payments, Purchaser would not have entered into this Agreement, and (iii) time is of the essence with respect to the payment of the Break-Up Fee and the Expense Reimbursement. Seller accordingly agrees that in the event that Seller fails to pay the Break-Up Fee and the Expense Reimbursement in accordance with this Section 7.3 promptly, Seller shall, in addition to the payment of such amounts, also pay to Purchaser all of its reasonable costs and expenses (including reasonable attorneys' fees and expenses) incurred by Purchaser in the enforcement of its rights under this Section 7.3, together with interest on such amount accruing from the date of such failure at a rate of 10% per annum from the date upon which such payment was due, to and including the date of payment.

7.4.    **Bankruptcy Estate Consolidation**.  Within 20 days after the Petition Date, Seller shall file with the Bankruptcy Court an application, in form and substance satisfactory to Purchaser, to obtain a final order from the Bankruptcy Court substantively consolidating the bankruptcy estates of AIW, Southwest, Advertising, and AlaMark (a "Consolidation Order") on or prior to Closing.  If within 45 days after the Petition Date, the Bankruptcy Court has not granted a Consolidation Order, Seller shall furnish to Purchaser a written report listing (a) all of the assets and liabilities owned by each of AIW, Southwest, Advertising, and AlaMark, respectively, indicating the owner of each asset and liability, and (b) the book value of each asset and the dollar amount of each liability.  Purchaser shall thereupon have the sole discretion to determine the allocation of the Purchase Price among each Seller and to pay the Purchase Price among each Seller in accordance with such determination, provided that in no event shall Purchaser allocate more than $100,000 and $25,000 of the Purchase Price to AlaMark and Advertising, respectively.

## ARTICLE VIII
## COVENANTS

8.1.    **Access to Information; Inventory Inspection.**

(a)    Prior to the Closing Date, Purchaser shall be entitled, following notice from Purchaser to Seller in accordance with Section 12.7, through its officers, employees, consultants and representatives (including its legal advisors and accountants), to make such investigation of the properties, businesses and operations of Seller and the Business and such examination of the books and records of Seller and the Business, the Assets and the Assumed Liabilities as it reasonably requests and to make extracts and copies of such books and records.  Any such investigation and examination shall be conducted upon reasonable advance notice and under reasonable circumstances and shall be subject to restrictions under applicable Law.  Seller shall cause its respective officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with Purchaser and Purchaser's representatives in connection with such investigation and examination, and Purchaser and its representatives shall cooperate with Seller and its representatives and shall use its reasonable efforts to minimize any disruption to the Business. Purchaser shall give Seller reasonable advance written notice of all inspections, setting forth the inspection or materials that Purchaser or its representatives intend to conduct.  Upon the termination of this Agreement in accordance herewith, at Seller's

request, Purchaser shall destroy or return to Seller all copies and extracts of Seller's books and records made by Purchase prior to termination.

(b)     Within 10 days prior to the Closing Date, Purchaser and Purchaser Representatives shall conduct a physical inspection and accounting of the Inventory (the "Physical Inventory"). Purchaser shall pay its own costs and expenses associated with conducting the Physical Inventory.

## 8.2.    Real Estate Matters.

(a)     Prior to the Closing Date, Seller shall permit Purchaser and the Purchaser Representatives the right to enter upon the Business Facilities at all reasonable times during normal business hours to perform reasonable investigations, studies, and tests, including surveys and engineering studies, of the Business Facilities as Purchaser deems necessary or desirable.  Notwithstanding anything to the contrary contained herein, no physically invasive testing, other than a Phase I and Phase II environmental site assessment (either or both, in Purchaser's sole discretion), shall be conducted during any such entry by Purchaser or any Purchaser Representative upon the Business Facilities, without Seller's prior written consent, which consent shall not be unreasonably withheld, delayed, or conditioned.  Purchaser and the Purchaser Representatives shall have the right to communicate directly with the parties to the Service Contracts for any good faith reasonable purpose in connection with the transactions contemplated by this Agreement. In entering upon and inspecting or examining the Business Facilities, Purchaser and the Purchaser Representatives shall not take any action that would intentionally and knowingly unreasonably interfere with the use of the Business Facilities; unreasonably interfere with the operation and maintenance of the Business Facilities; damage any part of the Property or any personal property owned or held by any Person;  injure or otherwise cause bodily harm to Seller  or Seller's respective agents, guests, invitees, contractors, and employees, or to any other Person; or permit any liens to attach to the Business Facilities by reason of the exercise of Purchaser's rights under this Section 8.2(a).

(b)     Within 15 days from the date hereof, Seller shall cause Alamo Title Company (the "Title Company") to issue and deliver to Purchaser a current title commitment (the "Title Commitment") for a Texas (Form T-1) Land Title Association's Owner's Title Policy (the "Title Policy") in amounts acceptable to Purchaser for the 943 AT&T Center  Parkway Property and the 126 Gonzales Street Property, together with legible copies of all documents referenced in the Title Commitment (collectively, the "Title Commitment Documents") with respect to each Property.

(c)     If a new survey with respect to either of the Properties is required by PNC Bank or is otherwise required by Purchaser in its reasonable discretion, within 20 days after Seller is notified of such requirement, Seller shall obtain (and cause a copy to be delivered to Purchaser and the Title Company) an "as built" survey (the "Survey") of each Property with respect to which a survey is required, including access to and from the Property, consisting of a plat and field notes prepared by a licensed surveyor approved by Purchaser conforming to the Minimum Standard Detail Requirements for ALTA/ASCM

Land Title Surveys (as adopted in 1999), including items 1, 2, 3, 4, 6, 7(a), 7(b)(1), 7(c), 8, 9, 10, 11, 14, 15 and 16 of Table A thereof. Each Survey shall be acceptable to the Title Company for the Title Company to delete what is commonly called the "Survey Exception" (except as to shortages in area). The cost of the Survey shall be paid by Seller.

(d)    On the Closing Date, Seller shall cause the Title Company to issue to Purchaser the Title Policy, including a T-19.1 endorsement, at Seller's cost, insuring good and indefeasible title to the Property comprising the Business Facilities in Purchaser in accordance with the Title Commitment, subject only to the standard printed exceptions, except that the exception as to discrepancies, conflicts, shortages in area, or boundary lines or any encroachments, protrusions, or overlapping of improvements shall be deleted (except for "shortages in area"); the standard printed exception pertaining to Taxes shall be limited to the year in which the Closing occurs and subsequent years and subsequent assessments for prior years due to change in land usage or ownership; there shall be no exception for lack of access; and all arbitration provisions shall be deleted.

## 8.3.    Conduct of the Business Pending the Closing.

(a)    Except (i) as required by applicable Law or required, authorized, or restricted pursuant to an Order of the Bankruptcy Court, (ii) as otherwise expressly contemplated by this Agreement, or (iii) as required directly by or as the practical effect of any DIP Lender financing, or as a result of the filing of bankruptcy, or (iv)  with the prior written consent of Purchaser and the approval of the Bankruptcy Court after notice and hearing, during the period from the date of this Agreement to and through the Closing Date, Seller shall:

(i)    conduct the Business only in the Ordinary Course of Business; and

(ii)    use their commercially reasonable efforts to (A) preserve the present business operations, organization, and goodwill of the Business, and (B) preserve the present relationships with customers, employees, and suppliers of the Business.

(b)    Except (i) as required by applicable Law, (ii) as otherwise contemplated by this Agreement, or (iii) with the prior written consent of Purchaser and the approval of the Bankruptcy Court after notice and hearing, Seller shall not:

(i)    (A) increase the annual level of compensation payable or to become payable by Seller to any of its directors or executive officers, (B) grant any bonus, benefit, or other direct or indirect compensation to any director or executive officer, (C) increase the coverage or benefits available under any (or create any new) Employee Plan or (D) enter into any employment, deferred compensation, severance, consulting, non-competition, or similar agreement (or amend any such agreement) to which Seller is a party or involving a director or executive officer of Seller, except, in each case, in the ordinary course of business as required by any of the Employee Plans;

(ii)   make or rescind any material election relating to Taxes, settle or dismiss any material claim, action, suit, litigation, proceeding, arbitration, investigation, audit or controversy relating to Taxes, or, except as may be required by the Code or GAAP, make any material change to any of its methods of accounting or methods of reporting income or deductions for Tax or accounting practice or policy from those employed in the preparation of its most recent audited financial statements or Tax Returns, as applicable;

(iii)   subject any of the Assets to any Encumbrance, except for existing Encumbrances and Permitted Encumbrances or the DIP Financing;

(iv)   other than in the ordinary course of business, acquire any material properties or assets that would be Assets or sell, assign, license, transfer, convey, lease, or otherwise dispose of any of the Assets;

(v)   cancel or compromise any material debt or claim or waive or release any material right of Seller that constitutes an Asset;

(vi)   enter into any commitment for capital expenditures in excess of $25,000 for any individual commitment and $50,000 for all commitments in the aggregate;

(vii)   enter into, modify or terminate any labor or collective bargaining agreement or, through negotiation or otherwise, make any commitment or incur any liability to any labor organization;

(viii)   engage in any transaction with any officer, director, or Affiliate of Seller or any officer, director or Affiliate of any of the foregoing;

(ix)   modify, amend, terminate, or reject any Assumed Contract;

(x)   sell or otherwise convey any remnants or scrap other than sales of scrap bins used in the normal course of business;

(xi)   invoice or bill any retainage unless otherwise permissible pursuant to the terms of the applicable Contract to which such retainage relates; or

(xii)   agree to do anything prohibited by this Section 8.2 or do or agree to do anything that would cause Seller's representations and warranties herein to be false in any material respect.

**8.4.   Consents.**   Seller shall use its commercially reasonable efforts, and Purchaser shall cooperate with Seller, to obtain at the earliest practicable date all consents and approvals required to consummate the transactions contemplated by this Agreement, including the consents and approvals referred to in Section 5.2(c).

**8.5.   Further Assurances.**   Subject to the other provisions of this Agreement, each of Purchaser and Seller shall use its commercially reasonable efforts to (a) take all actions

necessary or appropriate to consummate the transactions contemplated by this Agreement and (b) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

**8.6.    Preservation of Records.**  Seller and Purchaser shall preserve and keep the records held by it or their Affiliates relating to the Business for a period of seven years from the Closing Date (except as provided below) and shall make such records and personnel available to the other as may be reasonably required by such party in connection with, among other things, any insurance claims by, legal proceedings or Tax audits against or governmental investigations of Seller or Purchaser or any of their Affiliates or in order to enable Seller or Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby.  If Seller or Purchaser wishes to destroy such records before or after that time, such party shall first give 90 days prior written notice to the other, and such other party shall have the right at its option and expense, upon prior written notice given to such party within such 90-day period, to take possession of the records within 180 days after the date of such notice.  With respect to any litigation and/or claims that are not Assumed Liabilities, Purchaser shall, at Seller's cost, render all reasonable assistance that Seller may request in defending such litigation or claim and shall make available to Seller personnel most knowledgeable about the matter in question.  If after the Closing, Purchaser (or any Affiliate or creditor of Purchaser) receives any payment or revenue that belongs to Seller pursuant to this Agreement, Purchaser shall promptly remit or caused to be remitted the same to Seller.  If after the Closing, Seller (or any Affiliate or creditor of Seller) receives any payment or revenue that belongs to Purchaser pursuant to this Agreement, Seller shall promptly remit or cause to be remitted the same to Purchaser. Seller may, at its election, provide its records to the Purchaser and be relieved of any maintenance requirements hereunder.

**8.7.    Publicity.**  None of the parties hereto shall issue any press release concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other party hereto, which approval will not be unreasonably withheld or delayed, unless, in the sole judgment of Purchaser or Seller, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement, provided that the party intending to make such release shall use its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other party with respect to the text thereof.  Within four Business Days after the execution of this Agreement, Seller and Purchaser shall transmit to each customer, vendor, and employee of Seller as is mutually agreed by Seller and Purchaser, a letter in form and substance mutually agreeable to Purchaser and Seller to the effect that Purchaser has made an offer to buy the Business, the offer is subject to court approval, and the Business is intended to continue.  Nothing in this Section 8.7 affects the right of Seller during the Solicitation Period to market the Business.

**8.8.    Supplementation and Amendment of Schedules.**  From time to time prior to the Closing, Seller shall have the right to supplement or amend the Schedules with respect to any matter hereafter arising or discovered after the delivery of the Schedules pursuant to this Agreement. No such supplement or amendment shall have any effect on the satisfaction of the condition to closing set forth in Section 10.1(a) or cure any breach of this Agreement; provided,

however, if the Closing shall occur, then Purchaser shall be deemed to have waived any right or claim pursuant to the terms of this Agreement or otherwise with respect to any and all matters disclosed pursuant to any such supplement or amendment at or prior to the Closing.

**8.9. Post-Closing Wind-Up.** After the Closing, Seller shall take such actions as may be required or advisable to avoid the use of any trade names or other property that is an Asset (including amending their corporate and partnership charters and other organizational documents to change their corporate and partnership names) and to accomplish the liquidation and winding-up of their estates (the "Wind-Up") as expeditiously and as efficiently as reasonably possible. At the request of Purchaser, Seller shall keep Purchaser apprised of all material developments with respect to the Assets and Assumed Liabilities in the course of the Wind-Up and shall promptly comply with any reasonable requests by Purchaser for information relating thereto. Nothing in this Agreement shall prevent Seller from winding up its businesses as soon as possible after Closing.

**8.10. Confidentiality.** Purchaser shall maintain as confidential all Confidential Information, except as required by Law; provided, however, that Purchaser may reveal Confidential Information to Purchaser Representatives (a) who need to know the information for the purpose of their involvement with the transactions contemplated by this Agreement, (b) who are informed by Purchaser of the confidential nature of the information, and (c) who agree to act in accordance with the terms of this Section 8.10. Purchaser shall take all commercially reasonable steps (and to cause each of the Purchaser Representatives to take all commercially reasonable steps) to safeguard such Confidential Information in its possession and to protect it against disclosure, misuse, loss, and theft. If Purchaser or any of its respective Purchaser Representatives is required by Law to disclose any Confidential Information (other than as a result of the Bankruptcy Case), Purchaser shall promptly notify Seller in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and Purchaser shall cooperate with Seller to preserve the confidentiality of such information consistent with applicable Law. Nothing herein shall be construed to limit Purchaser's or the Purchaser Representatives' use of Confidential Information relating to the Assets or Assumed Liabilities following the Closing. Upon any termination of this Agreement, at Seller's request, Purchaser shall destroy or return to Seller all Confidential Information in Purchaser's possession.

**8.11. Financing.** Seller shall provide, and shall use its commercially reasonable best efforts to cause its Representatives to provide, such reasonable cooperation in connection with the arrangement of the debt financing as may be reasonably requested by Purchaser, including participating in meetings and presentations, providing information, documents, opinions, and certificates, entering into agreements, and other actions that are or may be customary in connection with the debt financing or necessary to permit Purchaser to fulfill conditions or obligations under this Agreement.

**8.12. Employees.**

(a) Seller shall discharge all of its obligations and liabilities to any Business Employee under any and all pay and compensation practices, and under all of the Employee Plans and under any employment agreements or terms and conditions of employment (excluding only the accrued vacation time with respect to Business

Employees who accept Purchaser's offer of employment). Seller shall be responsible for and shall pay all severance costs, if any, in respect of Business Employees severed on or prior to the Closing Date. Notwithstanding the foregoing, Seller shall not, and shall not be required to, honor accrued vacation compensation.

(b)     Purchaser shall offer employment to those Business Employees who it determines in its sole discretion (the "Transferred Employees"), on terms and conditions satisfactory to Purchaser in its sole discretion, provided that Purchaser shall use its commercially reasonable efforts to provide to the Transferred Employees immediately after the Closing reasonably similar benefits as those provided by Seller to the Transferred Employees as of the date hereof. Purchaser shall neither assume, nor be obligated with respect to, any Employee Plan or any other employee benefit plan, arrangement, policy, procedure, or practice, including payroll practices, which are or have been maintained or contributed to by Seller prior to the Closing Date; provided, however, each Business Employee who accepts Purchaser's offer of employment shall be credited by Purchaser with his or her years of service with Seller for purposes of satisfying eligibility and vesting periods under Purchaser's Employee Plans (to the extent permissible under such Employee Plans). Effective on the Closing Date, Purchaser shall make available to Business Employees who accept its offer of employment participation in Purchaser's Employee Plans, including health insurance, that Purchaser makes available to its similarly situated employees, provided that such Business Employees satisfy the eligibility conditions of Purchaser's Employee Plans (after giving effect to the credits for years of service described above). Purchaser's health insurance shall not have any waiting period for Business Employees who accept Purchaser's offer of employment.

(c)     With respect to Transferred Employees, Purchaser and Seller shall use the alternative procedure set forth in Revenue Procedure 2004-53, 2004-34 I.R.B. 320, for purposes of employment tax reporting.

(d)     Nothing contained herein, express or implied (i) shall be construed to establish, amend or modify any Employee Plan, (ii) is intended to confer or shall confer upon any Business Employee any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment, (iii) is intended to confer or shall confer upon any individual or any legal representative of any individual (including employees, retirees, or dependents or beneficiaries of employees or retirees and including collective bargaining agents or representatives) any right as a third-party beneficiary of this Agreement, or (iv) shall be deemed to confer upon any such individual or legal representative any rights under or with respect to any plan, program, or arrangement described in or contemplated by this Agreement, and each such individual or legal representative shall be entitled to look only to the express terms of any such plan, program, or arrangement for his or her rights thereunder.

(e)     After the Petition Date, Seller intends to terminate the Employee Benefit Plans set forth on Schedule 8.12(e). Prior to Closing, without Purchaser's prior written consent, Seller shall not terminate any Employee Benefit Plans other than those set forth in Schedule 8.12(e). Seller shall notify Purchaser in writing at least two Business Days

prior to Seller terminating any of the Employee Benefit Plans set forth on Schedule 8.12(e).

**8.13. Weekly Financial Reports.** From and after the date of this Agreement until the Closing Date, Seller shall prepare and deliver to Purchaser on each Tuesday a weekly financial report, in the form attached hereto as Exhibit C (the "Weekly Financial Reports"), showing Seller's cash flow and flash sales performance during the immediately preceding week as compared to the Weekly Budget.

**8.14. Collection of Accounts Receivable.** For a period of 180 days from and after the Closing Date, Purchaser shall take in good faith all action reasonably necessary to collect the Accounts Receivable outstanding as of the Closing Date (the "Pre-Closing Accounts Receivable"). Such collection efforts may be conducted in conjunction with the collection of accounts receivable due Purchaser from the sale of goods and services after the Closing to a Pre-Closing Accounts Receivable debtor. Purchaser shall not be required, with respect to any uncollected account receivable that is either a Pre-Closing Account Receivable or an account receivable generated by Purchaser after the Closing from a sale to a customer who at the time of the collection is also an account debtor with respect to a Pre-Closing Account Receivable, (a) attempt to repossess involuntarily any goods to which any such uncollected account receivable relates, (b) institute suit or otherwise initiate any type of legal proceeding for the purpose of collecting any such uncollected account receivable, or (c) seek assistance from any collection agency or other third party for the purpose of collecting any such account receivable. If Purchaser is unwilling to undertake such collection actions as may be lawful and reasonable to effect collection, Seller or its successor shall be entitled to pursue such collection efforts, provided that Seller or its successor shall not file any lawsuit or seek assistance from any collection agency or other third party for the purpose of collecting any such account receivable unless (i) such lawsuit is commenced or collection agency or third party is retained 90 days following the Closing Date and (ii) the dollar amount of such account receivable represents in excess of 1% of the dollar amount of all Pre-Closing Accounts Receivable. Purchaser shall not be restricted in any manner in connection with its collection of accounts receivable generated by Purchaser after the Closing that are owed by account debtors who do not at the time such accounts receivable are to be collected owe Seller any money as part of the Pre-Closing Accounts Receivable. To the extent that Purchaser receives a payment against an account receivable after the Closing Date which can be specifically identified with a particular invoice, such payment shall be allocated to that particular invoice; otherwise such payment shall be allocated to the then outstanding oldest invoice of such debtor. Notwithstanding the preceding sentence, no payment shall be allocated to any invoice if such debtor has notified Purchaser or Seller that it is contesting such invoice. To the extent that all or a portion of a particular payment is allocated to a Pre-Closing Accounts Receivable, Purchaser shall deposit such payment, or relevant portion thereof, less the Collection Services Fee, into a bank account designated by Seller within three Business Days of receipt of such payment by Purchaser. Purchaser shall provide Seller with a report of the results of Purchaser's efforts to collect the Pre-Closing Accounts Receivable within 20 days after the end of each month after the Closing Date. Seller shall have the right, during normal business hours and upon reasonable prior notice, to review Purchaser's books and records, to confirm that the collection of and accounting for Pre-Closing Accounts Receivable have been handled in a manner that is consistent with the provisions of this Section 8.14. As consideration for Purchaser's services provided pursuant to this Section 8.14,

Purchaser shall be entitled to retain from the amount of the Pre-Closing Accounts Receivable collected by Purchaser an amount equal to 5% of such amount (the "Collection Services Fee"). If Seller or its Affiliates or successors receives any portion of the Pre-Closing Accounts Receivable directly from the applicable debtor, Seller shall remit to Purchaser within two Business Days of such receipt the Collection Services Fee applicable to the amount received. At the end of such 180-day period, Purchaser shall return all uncollected Pre-Closing Account Receivables to Seller or its successor with all relevant information as to collections generated by Purchaser and a final accounting of all collections on behalf of Seller.

## ARTICLE IX
## NONCOMPETITION COVENANTS

**9.1.    Prohibited Activities.**

(a)    As additional consideration for the Purchase Price, Seller shall not, directly or indirectly, for itself or on behalf of or in conjunction with any Third Person:

(i)    during the Seller Noncompete Term engage in any capacity, whether as a manager, member, shareholder, owner, partner (limited or general), or joint venturer, or in any managerial or advisory capacity, whether as an independent contractor, consultant, advisor, or sales representative, or otherwise, in any Competitive Business in the Territory;

(ii)    during the Seller Noncompete Term, solicit or attempt to induce any Person who is, at that time, or who has been, within six months prior to that time, an employee or consultant of Purchaser to become an employee of Seller or any of its Affiliates; provided, however, nothing herein contained shall prevent Seller from general solicitations for employees consistent with past practices; or

(iii)    during the Seller Noncompete Term, call upon any Person which is, at that time, or which has been, within one year prior to that time, a customer of Seller, Purchaser, or any Affiliates of such parties within the Territory for the purpose of soliciting or selling services or products of a Competitive Business within the Territory.

(b)    This Section 9.1 shall not be deemed to prohibit Seller from acquiring, as a passive investor with no involvement in the operation of the business, not more than 1% of the capital stock of a Competitive Business the stock of which is publicly traded on a national securities exchange, The Nasdaq Stock Market, or over-the-counter.

**9.2.    Equitable Relief.** Because of the difficulty of measuring economic losses to Purchaser as a result of a breach of the covenants in this ARTICLE IX, because a breach of Seller's covenant would diminish the value of the assets and business of Seller being sold pursuant to this Agreement, and because of the immediate and irreparable damage that could be caused to Purchaser for which it would have no other adequate remedy, each of the parties agree that the covenants in this ARTICLE IX, may be enforced against it by injunctions, restraining orders, and other equitable actions, in all cases without the need to prove actual damages and

without the need to post any bond or other form of security. Nothing herein shall be construed as prohibiting any party hereto from pursuing any other available remedy for such breach or threatened breach, including the recovery of damages.

**9.3.    Reasonable Restraint.**    The parties agree that the covenants in Section 9.1 are necessary in terms of time, activity, and territory to protect Purchaser's interest in the assets and business being acquired pursuant to this Agreement and impose a reasonable restraint on Seller in light of the activities and businesses of Seller on the date of the execution of this Agreement and the current plans of Seller.

**9.4.    Severability; Reformation.**    The covenants in this ARTICLE IX are severable and separate, and the unenforceability of any specific covenant shall not affect the continuing validity and enforceability of any other covenant. If any court of competent jurisdiction shall determine that the scope, time or territorial restrictions set forth in this ARTICLE IX are unreasonable and therefore unenforceable, the parties intend that such restrictions be enforced to the fullest extent that the court deems reasonable and this Agreement shall thereby be reformed.

**9.5.    Material and Independent Covenant.**    Seller acknowledges that its agreements and the covenants set forth in Section 9.1 are material conditions to Purchaser's agreements to execute and deliver this Agreement and the Purchaser Ancillary Agreements and to consummate the transactions contemplated hereby and thereby and that Purchaser would not have entered into this Agreement and the Purchaser Ancillary Agreements without such covenants. All of the covenants in Section 9.1 shall be construed as an agreement independent of any other provision in this Agreement and the Purchaser Ancillary Agreements.

**ARTICLE X**
**CLOSING CONDITIONS**

**10.1.    Conditions Precedent to Obligations of Purchaser.**    The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)    the representations and warranties of Seller contained in this Agreement that are not qualified by materiality or Seller Material Adverse Effect shall be true and correct in all material respects on and as of the Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and the representations and warranties of Seller contained in this Agreement that are qualified by materiality or Seller Material Adverse Effect shall be true and correct in all respects on and as of the Closing, and Purchaser shall have received a certificate signed by an authorized officer of AIW, Southwest, and Advertising, and an authorized officer of the general partner of AlaMark, dated the Closing Date, to the foregoing effect;

(b)    Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date, and Purchaser shall have received a certificate signed by an

authorized officer of AIW, Southwest, and Advertising, and an officer of the general partner of AlaMark, dated the Closing Date, to the forgoing effect;

(c)     Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2;

(d)     Purchaser shall have received from the Bankruptcy Court a Sale Order in form and substance satisfactory to Purchaser;

(e)     Purchaser shall have received from the Bankruptcy Court an order in form and substance satisfactory to Purchaser that Purchaser has no successor liability with respect to Seller or the Business, including any obligation or liability to provide Continuation Coverage or other comparable coverage for the benefit of current or former employees of Seller;

(f)     the DIP Lender shall have provided debtor-in-possession financing to Seller pursuant to the DIP Credit Agreement on or before the Sale Hearing sufficient to maintain Seller's normal and customary business operations and to allow Purchaser to achieve its financial projections through Closing, provided that the Waiver Date with respect to this condition is the date on which the hearing in the Bankruptcy Court to approve the Bidding Procedures Order is held, and provided further that there shall be no Waiver Date with respect to this condition if the debtor-in-possession financing to Seller pursuant to the DIP Credit Agreement is at any time materially modified or amended, on terms determined by Purchaser to be unfavorable to Seller or the Business, or is terminated;

(g)     there shall not have occurred any Seller Material Adverse Effect;

(h)     PNC Bank and Purchaser shall have entered into agreements pursuant to which PNC Bank shall have loaned to Purchaser an aggregate of $5,000,000, secured solely by the Business Facilities, on terms and conditions acceptable to Purchaser in its sole discretion, provided that the Waiver Date with respect to this condition is the close of business on the fifth Business Day prior to the Auction Date;

(i)     Purchaser shall have entered into a lease agreement, in form and substance satisfactory to Purchaser in its sole discretion, with AIW Joint Venture – 1992 pursuant to which Purchaser shall lease from AIW Joint Venture – 1992 certain real property comprising a parking lot for an 18-month term, with an 18-month renewal option, at a monthly rental rate of $2,000, with a right of first refusal by Purchaser to purchase the property prior to AIW Joint Venture – 1992 accepting any offer to sell the property, provided that the Waiver Date with respect to this condition is the close of business on the 10th Business Day prior to the Auction Date;

(j)     Purchaser shall have entered into a lease agreement, in form and substance satisfactory to Purchaser in its sole discretion, with Universal Equipment Leasing Co. pursuant to which Purchaser shall lease from Universal Equipment Leasing Co. certain equipment for a one-year term, with renewal options, at a monthly rental rate of $12,000,

provided that the Waiver Date with respect to this condition is the close of business on the 10th Business Day prior to the Auction Date;

(k)     Purchaser shall have entered into a contract, in form and substance satisfactory to Purchaser in its sole discretion, with Alaron Supply Company, Inc. and Advo Supply Company, Inc. with respect to the management and servicing of certain order fulfillment activities after the Closing, provided that the Waiver Date with respect to this condition is the close of business on the 10th Business Day prior to the Auction Date;

(l)     there shall not have been any legal or regulatory action or proceeding pending or threatened by any Person which, if adversely determined, could have a material, adverse, and direct effect on the Assets or Purchaser's proposed use of the Assets;

(m)     Purchaser and certain Business Employees selected by Purchaser in its sole discretion shall have entered into within 10 days prior to the Auction Date employment or consulting agreements in form and substance satisfactory to Purchaser in its sole discretion, provided that the Waiver Date with respect to this condition is the close of business on the fifth Business Day prior to the Auction Date;

(n)     Koch and Mark Sobotik shall have entered into on or before the Sale Hearing employment or consulting agreements with Purchaser, on mutually agreeable terms and conditions, which contain the same non-competition restrictions as set forth in Section 9.1(a) which restrictions shall be effective during such time that they are employed by, or an independent contractor to, Purchaser and for two years thereafter, provided that the Waiver Date with respect to this condition is the close of business on the date of the Sale Hearing;

(o)     Seller's gross sales with a gross profit margin of at least 21% (excluding fabrication sales and sales of product purchased from Industrial Distribution Group, Inc.), as reflected in the Weekly Financial Reports, shall not have been less than (i) 85% of the weekly gross sales reflected in the Weekly Budget for the first two weeks beginning with the week in which this Agreement is fully executed; (ii) 88% of the weekly gross sales reflected in the Weekly Budget for each subsequent week thereafter; or (iii) 88% of the total gross sales reflected in the Weekly Budget on a cumulative basis, provided in each case that the Waiver Date with respect to this condition is the Auction Date;

(p)     Neither of Seller's receipts nor disbursements, as reflected in the Weekly Financial Reports, shall have varied by more than (i) 12% of the weekly receipts or disbursements, as applicable, reflected in the Weekly Budget for such week; or (ii) 10% of the total receipts or disbursements, as applicable, reflected in the Weekly Budget on a cumulative basis beginning with the week after the week in which this Agreement is fully executed, provided in each case that the Waiver Date with respect to this condition is the Auction Date; and

(q)     Purchaser shall have completed to its satisfaction its review and inspection of the Property, the Title Commitment Documents, and the Survey, provided that the Waiver Date with respect to this condition is the close of business on the fifth Business Day prior to the Auction Date.

**10.2.   Conditions Precedent to Obligations of Seller.**   The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Purchaser contained in this Agreement that are not qualified by materiality shall be true and correct in all material respects on and as of the Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect;

(b)     Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect; and

(c)     Purchaser shall have delivered to Seller all of the items set forth in Section 4.3.

**10.3.   Conditions Precedent to Obligations of Purchaser and Seller.**   The respective obligations of Purchaser and Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Seller in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Order by a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; and

(b)     the Bankruptcy Court shall have entered the Sale Order, in form and substance reasonably acceptable to Seller and Purchaser, and such Sale Order shall have become a final Order.

**10.4.   Frustration of Closing Conditions.**   No party hereto may rely on the failure of any condition set forth in Sections 10.1, 10.2, or 10.3, as the case may be, if such failure was caused by such party's failure to comply with any provision of this Agreement.

## ARTICLE XI
## TAXES

**11.1. Transfer Taxes.** To the extent that the transactions contemplated by this Agreement are not otherwise exempt under section 1146(a) of the Bankruptcy Code, Seller shall be liable for all sales, use, and other transfer Taxes and all filing and recording fees (and any penalties and interest associated with such Taxes and fees) arising from or relating to the consummation of the transactions contemplated by this Agreement (collectively, "Transfer Taxes"). Seller and Purchaser shall cooperate and consult with each other prior to filing any Tax Returns in respect of Transfer Taxes and shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for Transfer Taxes.

**11.2. Purchase Price Allocation.** Seller and Purchaser shall allocate the Purchase Price among Seller and among the Assets of each Seller in accordance with a statement (the "Allocation Statement") provided by Purchaser to Seller as soon as practicable after the Closing (and after providing Seller with an opportunity to review and comment on a draft statement), which statement shall be prepared in accordance with Section 1060 of the Code, provided that in no event shall the Allocation Statement provide that in excess of $100,000 and $25,000 of the Purchase Price be allocated to the assets of AlaMark and Advertising, respectively. The Purchase Price allocated to each Seller shall be comprised first of the Assumed Liabilities of each Seller and then the remainder of the Purchase Price. Purchaser and Seller shall file all Tax Returns (including Form 8594) consistent with, and shall take no Tax position inconsistent with the Allocation Statement.

**11.3. Cooperation and Audits.** Purchaser and Seller and their respective Affiliates shall cooperate fully with each other regarding Tax matters (including the execution of appropriate powers of attorney) and shall make available to the other as reasonably requested all information, records, and documents relating to Taxes governed by this Agreement until the expiration of the applicable statute of limitations period or extension thereof or the conclusion of all audits, appeals, or litigation with respect to such Taxes.

## ARTICLE XII
## MISCELLANEOUS

**12.1. Assignment.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person not a party to this Agreement. No assignment of this Agreement or of any rights or obligations hereunder may be made by either Seller or Purchaser (by operation of law or otherwise, other than the interest of Seller hereunder passing as a matter of law to the debtor-in-possession in the Bankruptcy Case) without the prior written consent of the other parties hereto and any attempted assignment without the required consents shall be void, provided that Purchaser may assign some or all of its rights and obligations hereunder to one or more of its Affiliates or, in connection with the sale or other transfer of a substantial portion of Purchaser's business after the Closing, to any Third Person. No assignment of any obligations hereunder shall relieve the parties hereto of any such obligations prior to the Closing, but after which the assignee shall become solely responsible for any obligations assigned to it. Upon any such permitted assignment, the references in this

Agreement to Seller or Purchaser shall also apply to any such assignee unless the context otherwise requires.

**12.2. Entire Agreement.** This Agreement (including the attached Schedules and Exhibits), the Purchaser Ancillary Agreements, and the Seller Ancillary Agreements constitute the entire agreement and understanding between Seller and Purchaser and supersede any prior agreement and understanding relating to the subject matter of this Agreement, including the Confidentiality Agreement.

**12.3. Amendment; Waiver.** This Agreement may be modified or amended only by a written instrument executed by Seller and Purchaser. No waiver of compliance with any provision or condition hereof, and no consent provided for herein, will be effective unless evidenced by an instrument in writing duly executed by the party sought to be charged therewith. No failure on the part of any party hereto to exercise, and no delay in exercising, any of its rights hereunder shall operate as a waiver thereof, nor will any single or partial exercise by any party of any right preclude any other or future exercise thereof or the exercise of any other right.

**12.4. Expenses.** Except as otherwise provided in this Agreement, each of Seller and Purchaser shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document, and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby.

**12.5. Exercise of Rights and Remedies.** Except as otherwise provided herein, no delay of or omission in the exercise of any right, power or remedy accruing to any party as a result of any breach or default by any other party under this Agreement shall impair any such right, power or remedy, nor shall it be construed as a waiver of or acquiescence in any such breach or default, or of any similar breach or default occurring later; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default occurring before or after that waiver.

**12.6. Reformation and Severability.** In case any provision of this Agreement shall be invalid, illegal or unenforceable, it shall, to the extent possible, be modified in such manner as to be valid, legal and enforceable, but so as to most nearly retain the intent of the parties, and if such modification is not possible, such provision shall be severed from this Agreement, and in either case, the validity, legality, and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby.

**12.7. Notices.** Each notice, demand, waiver, consent, and other communication required or permitted to be given hereunder will be in writing and will be sent either by (i) personal delivery, (ii) registered or certified first-class mail, postage prepaid and return receipt requested, (iii) national commercial courier service, or (iv) facsimile, in each case addressed as follows:

      (a)     If to Purchaser, addressed as follows:

           Alamo Distribution, LLC
           301 Commerce Street, Suite 1600
           Fort Worth, Texas 76102

Attn: Brad Wallace
Facsimile: (817) 332-4630

with a copy (which shall not constitute notice) to:

Gardere Wynne Sewell LLP
1601 Elm Street, Suite 3000
Dallas, Texas 75201-4761
Attn: Lawrence Goldstein, Esq.
Facsimile: 214-999-3564

(b)     If to AIW, Southwest, or Advertising, AlaMark addressed as follows:

c/o Alamo Iron Works, Inc.
943 AT&T Center Parkway
P.O. Box 231 (78291)
San Antonio, Texas 78219
Attn: Tony Koch
Facsimile: 210-704-8360

with a copy (which shall not constitute notice) to:

Langley & Banack, Inc.
745 E. Mulberry, Ninth Floor
San Antonio, Texas 78212
Attn: Steve Brook
Facsimile: 210-735-6889

Each such notice and other communication given by (w) personal delivery will be deemed given when it is delivered, (x) mail will be deemed to have been given five days after it is deposited in the United States mail in the manner specified herein, (y) national commercial courier service will be deemed to have been given the first Business Day after it is delivered to such service, and (z) facsimile will be deemed to have been given when it is so transmitted and the appropriate confirmation of transmittal is received. Any party may change its address for the purpose hereof by giving notice in accordance with the provisions of this Section 12.7.

**12.8.   Governing Law.** This Agreement shall be construed in accordance with the laws of the State of Texas (except for its principles governing conflicts of laws).

**12.9.   Submission to Jurisdiction; Consent to Service of Process.**

(a)     Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to

the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 12.7; provided, however, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the state and federal courts located in Dallas County, Texas for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)     Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action, or proceeding by delivery of a copy thereof in accordance with the provisions of Section 12.7.

**12.10. Waiver of Right to Trial by Jury**. Each party to this Agreement waives any right to trial by jury in any action, matter, or proceeding regarding this Agreement or any provision hereof.

**12.11. Counterparts**. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one and the same instrument. Facsimile transmission of any signed original document or retransmission of any signed facsimile transmission will be deemed the same as delivery of an original. At the request of either party, the other will confirm facsimile transmission by signing a duplicate original document.

**12.12. Personal Liability**. Notwithstanding any provision hereof, except for fraud, no officer of Seller shall have any personal liability to Purchaser arising out of this Agreement.

**[Remainder of page left intentionally blank.]**

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the date first written above.

ALAMO DISTRIBUTION, LLC

By: _Charles A. Zingelfelt_
Name: _Charles A. Zingelfelt_
Title: _Manager_

ALAMO IRON WORKS, INC.

By: _Anthony H. Koch_
Name: _Anthony H. Koch_
Title: _Pres_

SOUTHWEST WHOLESALE SUPPLY CO., INC.

By: _Anthony H. Koch_
Name: _Anthony H. Koch_
Title: _Pres_

ALAMO ADVERTISING, INC.

By: _Anthony H. Koch_
Name: _Anthony H. Koch_
Title: _Pres_

ALAMARK TECHNOLOGIES, L.P.

By: AIG Management, LLC,
      its general partner

      By: _Anthony H. Koch_
      Name: _Anthony H. Koch_
      Title: _Pres_